**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, | ) |
|     *Plaintiff*, | ) ) ) |
| v. | ) No. 19 C 4547 ) |
| JUSSIE SMOLLETT, | ) Judge Virginia M. Kendall ) |
|     *Defendant*. | ) ) ) |

**MEMORANDUM OPINION AND ORDER**

The City of Chicago alleges that Jussie Smollett falsely reported that he was physically assaulted by two masked perpetrators who hurled racist and homophobic slurs at him. The City sued Smollett to recoup the costs it incurred investigating the attack. According to the City, the investigation revealed that the attack was actually an elaborate hoax staged by Smollett and two acquaintances. Smollett now moves to dismiss the City's complaint for failing to state a claim for relief under Rules 12(b)(6) and 9(b). Smollett's motion to dismiss [Dkt. 14] is denied.

**BACKGROUND**

The following factual allegations are drawn from the City's complaint (Dkt. 1-1) and are accepted as true for purposes of this motion to dismiss. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

**I.    The Attack**

Defendant Jussie Smollett is an actor on the television show "Empire," which is filmed primarily in Chicago. (Dkt. 1-1 ¶ 2.) While working on Empire, Smollett lived in the Streeterville neighborhood of Chicago. (*Id.*) In the fall of 2017, Smollett became friends with Abimbola

1

Osundario ("Abel"), who had worked with Smollett on Empire. (*Id.* ¶ 6.) Smollett and Abel exercised and socialized together. (*Id.*)

On the morning of January 25, 2019, Smollett texted Abel and asked him when he was leaving for his upcoming trip to Nigeria with his brother, Olabinjo Osundario ("Ola"). (*Id.* ¶ 7.) Abel responded that he and his brother were leaving four days later, on the evening of January 29. (*Id.* ¶ 8.) Smollett then texted Abel, "Might need your help on the low. You around to meet up and talk face to face?" (*Id.* ¶ 9.) Later that day, Smollett drove Abel from Cinespace Studio, where Empire is filmed, to Abel's apartment. (*Id.* ¶ 10.) During the drive, Smollett told Abel he was unhappy with the way his employers handled a racist and homophobic letter he had received three days earlier and, as a result, Smollett wanted to stage an attack where Abel would appear to batter him. (*Id.*) Smollett and Abel arrived at Abel's apartment around 5:00 p.m. (*Id.* ¶ 11.) When they arrived, Ola (who lived with Abel) came outside and got into Smollett's car. (*Id.*) Smollett asked Ola if he could trust him. (*Id.*) Ola told Smollett that he could, and the three began discussing their plan to stage a fake racist and homophobic attack on Smollett. (*Id.* ¶¶ 11-12.) Smollett directed Abel and Ola to stage the attack on the evening of January 28, 2019, near Smollett's Streeterville apartment. (*Id.* ¶ 12.) The three agreed that Abel and Ola would catch Smollett's attention and call him "an 'Empire F----- Empire N-----.'" (*Id.*)

Two days later, on January 27, Smollett met with Abel and Ola again to finalize the details of the staged attack. (*Id.* ¶ 13.) Smollett drove them to the location where he wanted the attack to take place, on the corner of New Street and North Water Street in Streeterville. (*Id.*) While at the location, Smollett pointed out a surveillance camera that he believed would capture the incident. (*Id.* ¶ 14.) Smollett and the brothers agreed that Abel would attack Smollett, but would not hurt him too badly, and would give Smollett a chance to appear to fight back. (*Id.* ¶ 15.) They also

discussed having the brothers place a rope around Smollett's neck and pour liquid on him. (*Id.* ¶ 16.) Smollett told Abel and Ola he wanted the attack to occur the following night at 10:00 p.m. and told the brothers not to bring their cell phones with them. (*Id.* ¶ 17.) Smollett gave Abel a $100 bill to purchase clothing and materials needed for the attack. (*Id.* ¶ 18.) During the same conversation, Smollett also gave Abel a personal check for $3,500. (*Id.* ¶ 19.) The check was made payable to Abel and the check's memo line read "5 week nutrition/ workout program (don't go)." (*Id.*) The next day, Abel and Ola bought a rope at a hardware store and clothing items at a beauty supply store, and Abel deposited the $3,500 check from Smollett in his bank account. (*Id.* ¶¶ 20-21.) The day after that, Abel transferred half that amount ($1,750) to Ola's bank account. (*Id.* ¶ 21.)

After Smollett met with Abel and Ola to finalize the details of the attack, he traveled to New York and was scheduled to return on January 28. (*Id.* ¶ 22.) On the evening of January 28, Smollett's flight back to Chicago was delayed, and he called Abel and told him he needed to delay the attack. (*Id.* ¶ 23.) Smollett's flight landed at Chicago O'Hare International Airport at 12:30 a.m. on January 29. (*Id.* ¶ 24.) At 12:49 a.m., Smollett and Abel spoke on the phone and Smollett told Abel the attack should take place at 2:00 a.m. at the agreed-upon location. (*Id.* ¶ 25.) Minutes later, Ola ordered an Uber to pick the brothers up at their apartment. (*Id.*)

Abel and Ola took an Uber from their apartment to the 1400 block of North Wells Street, where they hailed a taxi that dropped them off within three blocks of the agreed-upon attack location. (*Id.* ¶ 26.) From around 1:22 a.m. to 2:03 a.m., the brothers were on foot in an area bordered by Lake Shore Drive, the Chicago River, Columbus Drive, and Illinois Street. (*Id.* ¶ 27.) Smollett returned to his apartment around 1:30 a.m. (*Id.* ¶ 28.) At 1:45 a.m., Smollett left his apartment building on foot and walked to a nearby Subway restaurant at Illinois Street and

McClurg Court. (*Id.* ¶ 29.) Surveillance video shows Abel and Ola waiting near New Street and North Water Street at 2:00 a.m. (*Id.* ¶ 30.) Smollett was later interviewed on ABC's Good Morning America, which aired on February 14, 2019, and he positively identified the people shown in a still photo from this surveillance video (the "Still Photo") as his attackers. (*Id.* ¶ 31.) The two individuals in the Still Photo are Abel and Ola Osundario. (*Id.* ¶ 32.) Shortly after 2:00 a.m., Abel and Ola staged the attack on Smollett and then ran from the location, hailed a taxi, and were dropped off near their apartment at 2:25 a.m. (*Id.* ¶¶ 33-34.)

## II.     Smollett's First Report to the Chicago Police Department

Shortly after the incident, Smollett told his manager, Frank Gatson, that he had been attacked. (*Id.* ¶ 35.) At 2:27 a.m., Gatson called the Chicago Police Department ("CPD") to report the attack on Smollett. (*Id.*) At 2:42 a.m., CPD officers arrived at Smollett's apartment and found Smollett with a rope draped around his neck. (*Id.* ¶ 36.)

Smollett then proceeded to make a false police report. (*Id.* ¶ 37.) Smollett told CPD officers that he was a victim of a racist and homophobic physical attack. (*Id.* ¶ 38.) He gave this report to CPD officers despite knowing that the purported attack was not racially or homophobically motivated, that his attackers were actually his acquaintances Abel and Ola Osundario, and that he had asked them to stage the attack. (*Id.* ¶ 39.) Smollett told the CPD officers that his attackers placed a rope around his neck, poured a liquid chemical on him, and told him "this is 'MAGA Country.'" (*Id.* ¶ 40.) He did not tell the officers that the attacked was staged at his direction and with the cooperation of Abel and Ola, nor did he tell the officers that he knew his attackers or recognized their appearances or voices. (*Id.* ¶¶ 41, 43.) Smollett told the officers that his primary attacker (now known to be Abel) was wearing a ski mask that covered his entire face except for the area around his eyes, by which Smollett could tell that the attacker was white.

(*Id.* ¶ 45.) Smollett made this statement despite knowing that Abel and Ola are not white. (*Id.*) By providing a false description, Smollett misled the officers to believe his attackers were white, when Smollett in fact knew that the attackers were Abel and Ola. (*Id.* ¶ 46.) Smollett also told the officers the attack happened near a surveillance camera that should have captured the events, referring to the same camera he had pointed out to Abel and Ola a few days earlier. (*Id.* ¶ 42.) Smollett remained in contact with Abel and Ola after the staged attack. (*Id.* ¶ 47.)

### III. CPD's Investigation and Smollett's Second Report to CPD

For the next two weeks, CPD expended significant resources investigating Smollett's false report of a "high-profile hate crime and physical assault." (*Id.* ¶ 48.) Over two dozen CPD officers and detectives participated in the weeks-long investigation. (*Id.*) CPD incurred 1,836 overtime hours during the course of the investigation, which resulted in the City paying $130,106.15 in overtime pay as a result of Smollett's false statements to police. (*Id.*) After an extensive investigation using interviews, surveillance videos, Office of Emergency Management pod videos, in-car taxi camera videos, rideshare records, bank records, and a store receipt, CPD identified Abel and Ola as the perpetrators of the attack. (*Id.* ¶ 49.)

On February 13, 2019, Abel and Ola returned to Chicago from Nigeria. (*Id.* ¶ 50.) They were immediately and separately detained upon arrival at O'Hare. (*Id.*) CPD investigators obtained testimony and corroborating evidence from Abel and Ola showing that Smollett had orchestrated and staged the attack with Abel and Ola's cooperation and that Smollett's police report was false. (*Id.*)

On February 14, 2019, CPD officers interviewed Smollett about the Still Photo he identified on Good Morning America as depicting his attackers. (*Id.* ¶ 51.) Smollett again stated that he was certain the Still Photo depicted the men who attacked him. (*Id.*) CPD officers then

5

told Smollett that the men in the Still Photo had been identified as Abel and Ola Osundario. (*Id.* ¶ 52.) Smollett then falsely stated that he knew Abel and Ola only as trainers and social acquaintances and that they could not have been his attackers. (*Id.* ¶ 53.) During the February 14 interview, Smollett again failed to inform CPD officers that he knew Abel and Ola were his attackers and that he had orchestrated the attack with their cooperation. (*Id.* ¶ 54.)

**IV.     Relief Sought**

The City's two-count complaint brings claims under two sections of the Municipal Code of Chicago ("MCC"). The first section prohibits individuals from making false statements of material fact to the City (the "False Statements Ordinance" or "FSO"). MCC § 1-21-010. The second section provides that any person who engages in illegal activities and causes the City to incur costs while providing services reasonably related to those illegal activities is liable to the City for those costs (the "Cost Recovery Ordinance" or "CRO"). MCC § 1-20-020. Both claims are based on Smollett's false statements to police about the staged attack by the Osundario brothers.

In the FSO count, the City seeks (1) a $1,000 civil penalty for each false statement Smollett made; (2) treble damages in an amount to be proven at trial "which includes, but is not limited to, overtime compensation paid by the City;" and (3) its reasonable attorneys' fees and costs. In the CRO count, the City seeks (1) its "response costs" (*i.e.*, "necessary costs" the City incurred "investigating and responding to [Smollett's] statements made in violation of the MCC") in an amount to be proven at trial and (2) a civil penalty equaling the City's litigation and collection costs and attorneys' fees.

**DISCUSSION**

**I.     Jurisdiction**

The City originally sued Smollett in the Circuit Court of Cook County.  (*See* Dkt. 1-1.) Smollett removed the case to federal court on diversity jurisdiction grounds.  Smollett properly invokes this Court's jurisdiction, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332(a)(1).  Though Smollett was living in Chicago when the events of this case unfolded, he is a citizen of California for diversity jurisdiction purposes.  A person's citizenship depends on their domicile, or "the state in which a person intends to live over the long run."  *Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012).  All available evidence indicates that Smollett was living in Chicago temporarily and intends to live in California over the long run.  According to Smollett's affidavit, his permanent residence has been in Los Angeles, California since 1990, he lives there now and always intended to return and live there, he is registered to vote in California, he pays income and property tax in California, and his bank accounts and personal property are located there.  (Dkt. 1 ¶ 9.)  The weight of these factors indicates that Smollett is a California citizen.  *See, e.g.*, *Heinen*, 671 F.3d at 670; *Craig v. Ontario Corp.*, 543 F.3d 872, 876 (7th Cir. 2008) (considering party's voter registration, property ownership, and tax information to determine domicile); *Midwest Transit, Inc. v. Hicks*, 79 F. App'x 205, 208 (7th Cir. 2003) (domicile has been assessed using current residence, voting registration, location of personal and real property, location of financial accounts, and tax payments).

The City of Chicago is an Illinois municipal corporation and is a citizen of Illinois for diversity jurisdiction purposes.  (Dkt. 1-1 ¶ 1); *see, e.g.*, *City of Clinton, Ill. v. Moffitt*, 812 F.2d 341, 342 (7th Cir. 1987) ("[T]he City of Clinton, Illinois, is a municipal corporation of Illinois,

and for diversity purposes a municipal corporation is treated just like a regular business corporation"); *see also Muscarello v. Ogle Cty. Bd. of Com'rs*, 610 F.3d 416, 424 (7th Cir. 2010) ("It is well settled that for purposes of diversity of citizenship, political subdivisions are citizens of their respective States.") (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 97 (1972)). And the amount-in-controversy requirement is met because the City is seeking to recover at least 130,106.15. (Dkt. 1-1 ¶¶ 61-62, 67.)

## II. Legal Standard

To overcome a Rule 12(b)(6) motion, "a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court accepts the complaint's factual allegations as true and draws all permissible inferences in the City's favor. *Id.* However, "[w]hile a plaintiff need not plead 'detailed factual allegations' to survive a motion to dismiss, she still must provide more than mere 'labels and conclusions or a formulaic recitation of the elements of a cause of action' for her complaint to be considered adequate under [Rule] 8." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted); *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732,

8

737 (7th Cir. 2014). Rule 9(b) applies to "all averments of fraud, not claims of fraud." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'— in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Id.*; *see also City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1064 (N.D. Ill. 2016).

### III. The False Statements and Cost Recovery Ordinances

The FSO prohibits any person from "knowingly mak[ing] a false statement of material fact to the city in connection with any application, report, affidavit, oath, or attestation." MCC § 1-21-010(a). A person knowingly makes a false statement of material fact if he or she "makes a statement of material fact with actual knowledge that the statement was false." MCC § 1-21-010(d).

There are very few cases, at either the state or federal level, brought under the City's False Statements Ordinance. Luckily, key language in the False Statements Ordinance closely mirrors language in the City's False Claims Ordinance ("FCO").[1] And because Illinois courts would likely use state and federal False Claims Act cases when interpreting the City's False Claims Ordinance, *see City of Chicago ex rel. Rosenberg v. Redflex Traffic Sys., Inc.*, 884 F.3d 798, 802-03 (7th Cir. 2018), the Court will also look to state and federal False Claims Act cases to aid its interpretation of the City's False Statements Ordinance, given the similarity between the two ordinances.[2] *See*

---

[1] *Compare* the FSO (prohibiting any person from "knowingly mak[ing] a false statement of material fact to the city in connection with any . . . report") *with* the FCO (prohibiting any person from "knowingly mak[ing] . . . a false record or statement to get a false or fraudulent claim paid or approved by the city"). MCC §§ 1-21-010(a) and 1-22-020(a)(2).

[2] Smollett contends that the False Statements Ordinance is "part of the Chicago False Claims Act." It's not. The False Statements Ordinance is contained in Title 1, Chapter 1-21 of the Municipal Code of Chicago, while the False Claims Ordinance is separately contained in Title 1, Chapter 1-22 of the same. *See* MCC §§ 1-21 *et seq.* and 1-22 *et seq.* The City is not bringing any claims against Smollett under the False Claims Ordinance. The two ordinances are adjacent in the Municipal Code of Chicago and both fall within Title 1 ("General Provisions"), but Title 1 also contains chapters called Official Neighborhoods and Community Areas (Title 1, Chapter 1-14), Nuclear Weapon Free Zone (Title 1, Chapter 1-16), and Chicago Minimum Wage and Paid Sick Leave Ordinance (Title 1, Chapter 1-24). The fact that the False Statements Ordinance and False Claims Ordinance are adjacent or contained in the same Title of the

*also Purdue Pharma*, 211 F. Supp. 3d at 1076-81 (analyzing FSO and FCO claims together using federal False Claims Act cases).

The CRO provides that "any person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law . . . shall be liable to the city for those costs." MCC § 1-20-020. "Costs" is broadly defined to include:

> all costs of the city incurred in relation to the provision of services by the city or its agents, regardless of whether the city would have otherwise incurred those costs, including but not limited to wages and benefits of personnel involved in providing such services, reasonable costs of equipment used in the provision of such services, costs of materials expended in providing such services, costs of storing hazardous or any other materials recovered during the course of providing such services, or any other costs allocable to the provision of services.

MCC § 1-20-010.

## IV. Proximate Cause

Smollett argues that the City's claims fail because the complaint does not plausibly allege facts showing that Smollett's false statements proximately caused the City to incur overtime costs. In other words, Smollett argues the City did not plead facts showing that overtime costs were "ordinary and reasonable consequences" of the false police reports.

The City responds, in the first instance, by arguing that the issue of proximate cause is generally not resolved at the motion-to-dismiss stage. *See, e.g.*, *Palay v. United States*, 349 F.3d 418, 432-33 (7th Cir. 2003) ("Whether or not the defendant's conduct proximately caused the plaintiff's injury ordinarily is a question for the finder of fact to decide; only rarely are the facts so clear that the court can resolve the issue as a matter of law") (applying Illinois negligence law). But courts routinely consider whether plaintiffs have adequately pleaded proximate cause in cases

---

Municipal Code of Chicago does not, standing alone, make the ordinances part of the same statutory scheme or make the False Statements Ordinance "part of the Chicago False Claims Act," as Smollett suggests.

brought under the False Claims Act and similar laws. *See, e.g.*, *Purdue Pharma*, 211 F. Supp. 3d at 1079-81 (analyzing, on Rule 12(b)(6) motion, the sufficiency of proximate cause allegations for claims under Chicago's False Statements and False Claims Ordinances); *United States ex rel. Kennedy v. Aventis Pharm., Inc.*, 610 F. Supp. 2d 938, 943-44 (N.D. Ill. 2009) (analyzing, on Rule 12(b)(6) motion, the sufficiency of causation allegations for claims under the False Claims Act).

      **a.**      **FSO Claim**

In the False Claims Act context, "[c]ourts borrow general tort law principles to analyze the FCA's causation element." *Purdue Pharma*, 211 F. Supp. 3d at 1080. "Under the FCA, a defendant is answerable for the natural, ordinary and reasonable consequences of his conduct." *Id.* (citations and quotations omitted). Smollett argues that the City's FSO claim fails because the City's overtime costs were not ordinary and reasonable consequences of his false statements. According to Smollett, the City's allegations are too conclusory to show a causal connection between his false statements and the City's overtime investigation costs. Smollett accuses the City of falling for the *post hoc ergo propter hoc* fallacy—of incorrectly assuming, in other words, that because the City's investigation happened *after* the false statements, the investigation happened *because of* the false statements.

The City pleaded that Smollett made false reports to police officers and that CPD incurred costs investigating those false reports. The "natural, ordinary and reasonable consequence" of a police report is a police investigation. And the natural, ordinary and reasonable consequence of a police report like this one—a racist, homophobic physical assault in which masked attackers invoked the President of the United States' official campaign slogan—is an intensive, sprawling investigation like the one that took place. Smollett contends that police overtime pay is not "foreseeable in the normal course of events," but this is hardly the normal course of events—most

11

crime victims, for instance, do not have the opportunity to discuss the crime on Good Morning America. The allegations were taken seriously by the Chicago Police Department in significant part due to the high profile of the claimant and the extreme nature of the accusations.

The cases Smollett relies on are unavailing. In *Illinois v. Derengoski*, an Illinois appellate court overturned a criminal restitution order that included police overtime pay stemming from the defendants' arrests during a public protest. 617 N.E. 2d 882 (Ill. App. Ct. 1993). In doing so, the court rejected the state's argument that "overtime expenses are extraordinary expenditures for which the State ought to be reimbursed." *Id.* at 885. The court based its holding in part on its finding that the state was not a "victim" within the meaning of the relevant restitution statute and the state's lack of statutory authority to support its position. *Id.* Here, on the other hand, the City has properly invoked two ordinances that expressly authorize it to recover damages reasonably related to Smollett's false statements. In *Anderson v. United States*, Veteran's Administration nursing assistants sued the government to receive overtime pay. 201 Ct. Cl. 660 (1973), *overruled by Doe v. United States*, 372 F.3d 1347, 1357 (Fed. Cir. 2004). The court noted in passing that "overtime may be 'regular' and 'regularly scheduled,' though it is irregular and unforeseeable in its actual occurrence." *Id.* at 665. The facts of this since-overruled case from 1973 are simply too remote for it to be even marginally persuasive here. And even if Smollett could find case law to support his argument that police overtime pay is not foreseeable as a matter of law, it would not defeat the City's claims—as the City points out, it seeks relief beyond the costs of overtime pay. *See* Dkt. 1-1 ¶¶ 61-62 (alleging that the City "expended significant resources and manpower, including, *but not limited to*, $130,106.15 in CPD overtime pay" and seeking civil penalties and treble damages "in an amount to be proven at trial (which includes, *but is not limited to*, overtime compensation paid by the City") (emphases added).

  **b.**  **CRO Claim**

  Smollett similarly argues that the City's CRO claim fails because the complaint does not show a direct link between Smollett's statements and the City's investigation costs. Smollett relies on *Purdue Pharma*. In that case, the City sued pharmaceutical companies that make opioids and alleged that the companies made false statements to medical providers about opioid use for chronic pain, which caused the providers to prescribe opioids, which in turn caused the City to incur costs to pay for medically unnecessary opioid prescriptions through the City's health plan. 211 F. Supp. 3d at 1062-64. The City sued under both the FSO and CRO. The court dismissed the CRO claim because the City "failed to identify the prescribers who were exposed to defendants' misrepresentations as the same prescribers who prescribed defendants' drugs and thereby caused the City to incur costs." *Id.* at 1083. "Without this link," the court explained, the City "has not adequately alleged that defendants caused the City to incur costs." *Id.*

  There is no such missing link or middleman here. The City alleges that Smollett made false statements to Chicago police officers in violation of the FSO and that the City incurred costs investigating the false statements. As discussed above, the costs the City incurred investigating Smollett's false statements are "reasonably related" to the false statements for purposes of the CRO. And the City provides extensive detail about the false statements and the costs it incurred, which is more than enough to establish cause and effect. That is enough to state a claim under the CRO. Smollett argues that the City fails to identify the necessary services it seeks to recover costs for, but the City is not required to catalog its damages in detail at the pleading phase. And in any event, Smollett is wrong—the City alleges it incurred costs doing a weekslong "extensive investigation using interviews, surveillance videos, Office of Emergency Management pod videos, in-car taxi camera videos, rideshare records, bank records, and a store receipt," using "[o]ver two

13

dozen CPD officers and detectives," which required the City to pay $130,106.15 in overtime pay. (Dkt. 1-1 ¶¶ 48-49.)

**V.     Rule 9(b)**

Federal Rule of Civil Procedure 9(b) requires a party pleading fraud to "state with particularity the circumstances constituting fraud." "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Purdue Pharma L.P.*, 211 F. Supp. 3d at 1064 (citation omitted). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted).

The City's FSO claim is based on a fraudulent course of conduct (Smollett knowingly making false statements to the City), so Rule 9(b) applies to the allegations supporting that claim. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011) ("fraud includes misrepresentations, misleading omissions and embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain advantage over another by false suggestions or by the suppression of truth") (citations and quotations omitted); *see also, e.g.*, *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778-79 (7th Cir. 2016) (applying Rule 9(b)'s heightened pleading requirements to False Claims Act claims).

In the False Claims Act context, Rule 9(b) requires a plaintiff to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Id.* at 779. The City's complaint ticks each box. It alleges:

14

- the identity of the person making the misrepresentations: Smollett (*see* Dkt. 1-1 ¶¶ 38, 45, 53);
- the time: in the early morning of January 29, 2019, and on February 14, 2019 (*see id.* ¶¶ 36-37, 51);
- the place: Smollett's apartment (*see id.* ¶ 36);[3]
- the content of the misrepresentations: that Smollett was the victim of a racist and homophobic attack, that his attackers were white, and that his attackers could not have been the Osundarios (*see id.* ¶¶ 38, 45, 53);
- and the method by which the misrepresentations were made: orally (*see id.* ¶¶ 38, 45, 51, 53).

Smollett nonetheless argues that the City fails to meet Rule 9(b)'s heightening pleading standard because the complaint fails to allege exactly who Smollett made the false statements to. In Smollett's telling, the City's allegation that he made the statements to unnamed "CPD officers" does not give him enough information to understand the City's claims and effectively defend himself. The precise level of particularity required under Rule 9(b) depends on the facts of the case, and courts should not "take an overly rigid view" of the "who, what, when, where, and how" formulation. *See AnchorBank*, 649 F.3d at 615; *see also United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). With that in mind, and given the level of detail alleged in the complaint, Smollett has more than enough information to be on notice of the City's claims, respond to the City's allegations, and prepare an effective defense, even without the particular CPD officers' names. *See Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) ("fair notice is the most basic consideration underlying Rule 9(b)") (quotations omitted); *see also, e.g.*, *Swervo Entm't Grp., LLC v. Mensch*, No. 16 C 4692, 2017 WL 1355880, at *4 (N.D. Ill. April 13, 2017) (plaintiff adequately pleaded fraud under Rule 9(b) by alleging that defendant made statements "to Plaintiff," a corporate entity); *Medscript Pharm., LLC v. My Script, LLC*, 77 F.

---

[3] As explained further below, the City's failure to plead the location of the February 14, 2019 false statements does not mean that the City's fraud allegations fail under Rule 9(b), given the particular facts of this case and the underlying purpose of the Rule.

15

Supp. 3d 788, 793-94 (N.D. Ill. 2015) (plaintiff adequately pleaded fraud under Rule 9(b) by alleging that defendant made statements to plaintiff's "patients and prescribers").

## VI. Risk of Double Recovery

Smollett also argues that the Cost Recovery Ordinance claim should be dismissed because it improperly seeks a double recovery of the same relief sought in the False Statements Ordinance claim. Smollett is correct, as a general matter, that the City is allowed only one recovery to compensate its injuries. *See, e.g.*, *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 639 (7th Cir. 2011) ("In Illinois, as elsewhere, a plaintiff may receive only one full compensation for his or her injuries, and double recovery for the same injury is not allowed.") (applying Illinois law) (citation and quotations omitted). As the City points out, however, the two ordinances provide different remedies. The CRO allows the City to recover its costs "regardless of whether the city would have otherwise incurred those costs." MCC § 1-20-010. The FSO does not contain a provision to that effect. So Smollett could argue at a later stage that the FSO does not cover the City's costs incurred during regular business hours, though the CRO still might. The CRO also establishes a mandatory remedy (anyone who violates the CRO "shall be liable to the city for [its] costs," *see id.*), while the FSO allows the City to recover "up to three times the amount of damages" it sustained. Smollett could argue that the FSO is a discretionary remedy that allows the City to recover damages in an amount less than what it sustained, in which case the CRO would allow the City to recover damages beyond those authorized by the FSO. The CRO also provides for a monthly post-judgment interest penalty of .75% of any unpaid debt, unlike the FSO. MCC § 1-20-090.

To the extent the City is attempting to recover its investigation costs twice through both ordinances, it will not be allowed to do so. But dismissal of its CRO claim is not necessary (at least at this early stage of the proceedings) solely because there is a risk of double recovery, which

16

can be avoided through jury instructions or an amended judgment, if necessary. The Court may revisit this issue later in the proceedings, but the City can pursue relief under both claims for now. *See, e.g.*, *Graff v. Leslie Hindman Auctioneers, Inc.*, No. 17 C 6748, 2019 WL 3766121, at *3 (N.D. Ill. Aug. 9, 2019) (declining to dismiss complaint on the basis that it seeks a double recovery, pending later development of the issue through discovery); *Nardoni v. Moke*, No., 02 C 944, 2002 WL 1610988, at *4 (N.D. Ill. July 22, 2002) (declining to dismiss claim that provides for overlapping but partially unique relief because "[i]t is too early to tell how the two counts will actually play out").

## CONCLUSION

Finally, the Court must note that Smollett repeatedly raises the state criminal charges stemming from his statements to police, the fact that those charges were later dropped, the pending investigation into the propriety of the Cook County State's Attorney's investigation and prosecution, former mayor Rahm Emanuel's comments to the media about the case, and media coverage of the City's demand letter that preceded this litigation. As Smollett's attorneys are no doubt aware, those issues have nothing to do with whether the City has adequately pleaded claims against Smollett under the FSO and CRO. The City must prove the truth of these allegations to prevail at summary judgment or trial, at which point Smollett will be free to dispute the City's claims. But at this phase, the Court accepts the City's allegations as true and therefore disregards Smollett's attempts to muddy the waters with irrelevant arguments about the City's motivation for bringing this suit.

Smollett's motion to dismiss the City's complaint [Dkt. 14] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: October 22, 2019