**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO, a municipal corporation, | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-04547 |
| JUSSIE SMOLLETT, an individual, | |
| Defendant. | |
| | |
| JUSSIE SMOLLETT, | |
| Counterclaim-Plaintiff, | |
| v. | |
| CITY OF CHICAGO, MICHAEL THEIS, EDWARD WODNICKI, EDDIE JOHNSON, JOHN and JANE DOE DEFENDANTS 1-10, ABIMBOLA OSUNDAIRO, and OLABINJO OSUNDAIRO | |
| Counterclaim-Defendants. | |

## DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendant Jussie Smollett, by and through his attorneys, The Quinlan Law Firm, LLC, for

his Answer to Plaintiff City of Chicago's Complaint states as follows:

## NATURE OF THE CASE

1. This action is brought by the City to recover civil penalties, statutory treble

damages, and attorney's fees and costs arising from Defendant's false statements to the

City. On January 29, 2019, Defendant submitted a false police report claiming that he was the victim of a racist and homophobic beating by unknown attackers. In reality, Defendant knew his attackers and orchestrated the purported attack himself. Later, when police confronted him with evidence about his attackers, he still refused to disclose his involvement in planning the attack. In investigating Defendant's false statements and false police report, the City incurred significant costs in order to provide services reasonably related to Defendant's conduct.

**ANSWER:** This introductory paragraph is a statement of the case to which no response is required. To the extent that a response is required, Mr. Smollett denies the City's allegations.

## PARTIES

1.     The City is a municipal corporation organized and existing under the laws of the State of Illinois.

**ANSWER:** Admit.

2.     Defendant is an actor on the television show "Empire," which is primarily filmed in Chicago. While working on "Empire," and at all times relevant to this Complaint, Defendant resided in the Streeterville neighborhood in Chicago, Illinois.

**ANSWER:** Admit.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to the Illinois Constitution art. VI, § 9.

**ANSWER:** The paragraph sets forth Plaintiff's jurisdictional allegations that present legal conclusions and questions of law to be determined solely by the Court, to which no answer is required. To the extent that a response is required, Mr. Smollett denies that this Court has subject matter jurisdiction over this action under the Illinois Constitution.

4.     This Court has jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 because Defendant violated the MCC by making false statements in Chicago, Illinois, and the City incurred significant costs in order to provide services reasonably related to Defendant's false statements.

**ANSWER:** The paragraph sets forth Plaintiff's jurisdictional allegations that present legal conclusions and questions of law to be determined solely by the Court, to which no answer is required. To the extent that a response is required, Mr. Smollett denies that this Court has jurisdiction over him under 735 ILCS 5/2-209.

5.     Venue in Cook County is proper because this cause of action arose in Cook County, Illinois.

**ANSWER:** The paragraph sets forth Plaintiff's venue allegations that present legal conclusions and questions of law to be determined solely by the Court, to which no answer is required. To the extent that a response is required, Mr. Smollett denies that venue in Cook County is proper.

## FACTUAL ALLEGATIONS

### A. Defendant orchestrates and plans a fake attack.

**ANSWER:** Deny.

6.     In the fall of 2017, Defendant became friends with an individual named Abimbola Osundairo ("Abel"), who is 25 years old and has worked with Defendant on Empire. During the course of their friendship, Defendant and Abel socialized and exercised together, and Defendant occasionally asked for Abel's assistance in obtaining recreational drugs.

**ANSWER:** Admit.

7.     On the morning of January 25, 2019, Defendant texted Abel asking when Abel would be leaving on his upcoming trip to Nigeria with his 27-year-old brother, Olabinjo Osundairo ("Ola").

**ANSWER:** Mr. Smollett admits that he sent a text message to Abel Osundairo on January 25, 2019, asking when he was leaving town; otherwise, Mr. Smollett denies the allegations contained in paragraph 7.

8.    Abel responded to Defendant via text message that he and Ola were scheduled to depart the evening of January 29, 2019.

**ANSWER:** Mr. Smollett admits that Abel responded that he was leaving Tuesday night, January 29, 2019; otherwise, Mr. Smollett denies the allegations contained in paragraph 8.

9.    After Abel confirmed the date and time of his trip, Defendant texted Abel, "Might need your help on the low. You around to meet up and talk face to face?"

**ANSWER:** Admit. Answering further, Mr. Smollett contacted Abel sending the text message "Might need your help on the low. You around to meet up and talk face to face?" for purposes of obtaining herbal steroids that Abel had represented he could procure in Nigeria.

10.    That same day, January 25, 2019, OPS records and video evidence indicate that Defendant drove Abel from Empire's Cinespace Studio to Abel's apartment. During the ride, Defendant stated that he was unhappy with the way his employers handled a racist and homophobic letter he had allegedly received three days earlier, and, as a result, he wanted to stage an attack where Abel would appear to batter him.

**ANSWER:** Mr. Smollett admits that on January 25, 2019, he drove Abel from Empire's Cinespace Studio to Abel's apartment; otherwise, Mr. Smollett denies the allegations of paragraph 10.

11.    Video evidence shows that Defendant and Abel reached Abel's apartment at approximately 5:00 P.M. on January 25th. When they arrived, Ola, who was then living with Abel, came out of the apartment and sat with Defendant and Abel in Defendant's vehicle. Once inside, Defendant asked Ola if he could trust him and Ola assented.

**ANSWER:** Mr. Smollett admits that on January 25, 2019, he drove Abel to Abel's apartment, and that Ola Osundairo, who was outside when they arrived, got in Mr. Smollett's vehicle. Mr. Smollett is without sufficient knowledge or information to admit

4

or deny the contents of the alleged video evidence. Mr. Smollett denies the remaining allegations of paragraph 11.

12.     After Ola attested to his trustworthiness, Defendant and Abel and Ola (the "Osundairo Brothers") discussed their plan to stage a fake racist and homophobic attack on Defendant. Defendant directed the Osundairo Brothers to stage the fake attack on the evening of January 28, 2019, near his apartment building in Streeterville. Defendant and the Osundairo Brothers agreed that the Osundairo Brothers would catch Defendant's attention, and the fake attack would begin when the Osundairo Brothers called Defendant an "Empire F-----Empire N—"

**ANSWER:** Deny.

13.     On January 27, 2019, video, GPS, and text message evidence indicates that Defendant again met with the Osundairo Brothers to finalize the details of the staged attack. On that day, Defendant drove the Osundairo Brothers to the location where he wanted the staged attack to take place, which was the corner of New Street and North Water Street in Chicago, Illinois.

**ANSWER:** Mr. Smollett admits that on January 27, 2019, he drove the Osundairo Brothers to his residence in Chicago, Illinois. Mr. Smollett is without sufficient knowledge or information to admit or deny the contents of the alleged video, GPS, and text message evidence. Mr. Smollett denies the remaining allegations of paragraph 13.

14.     While at that location, Defendant directed the Osundairo Brothers' attention to a surveillance camera, which Defendant believed would capture the incident.

**ANSWER:** Deny.

15.     Defendant and the Osundairo Brothers coordinated the details of the fake attack. They agreed that Abel would attack Defendant, but would not hurt him too badly and would give Defendant a chance to appear to fight back.

**ANSWER:** Deny.

16. They also discussed having the Osundairo Brothers place a rope around Defendant's neck and pour liquid on him.

**ANSWER:** Deny.

17. Defendant told the Osundairo Brothers that he wanted the attack to take place the following night at 10:00 P.M., and instructed them not to bring their cell phones with them.

**ANSWER:** Deny.

18. Defendant provided Abel with a $100 bill to purchase the clothing and materials needed for the staged attack.

**ANSWER:** Deny.

19. During the same conversation in which Defendant and the Osundairo Brothers planned the fake attack, Defendant also gave Abel a three thousand five hundred dollar ($3,500) personal check made payable to Abel. The memo line of the check contained the words, "5 week nutrition/ workout program (don't go)."

**ANSWER:** Mr. Smollett admits that he gave Abel Osundairo a $3,500 personal **check** made payable to Abel with the memo line "5 week nutrition/ workout program (don't go)" for a five-week personal training and nutrition program in preparation for his music video shoot on February 23, 2019, for his song "Don't Go," and otherwise denies the allegations in paragraph 19.

20. Video evidence confirms that on January 28, 2019, the Osundairo Brothers purchased a rope at a hardware store and clothing items at a beauty supply store.

**ANSWER:** Mr. Smollett lacks knowledge or information sufficient to admit or deny the allegations in paragraph 20, and therefore denies the allegations therein.

21. Abel deposited the check Defendant gave him into Abel's bank account on January 28, 2019. The following day, Abel transferred half of that amount ($1,750) to Ola's bank account.

**ANSWER:** Mr. Smollett lacks knowledge or information sufficient to admit or deny the allegations in paragraph 21, and therefore denies the allegations therein.

**B. Defendant and the Osundairo Brothers execute the staged attack.**

**ANSWER:** Deny.

22.     After the "run-through" of the staged attack, Defendant traveled to New York, and was scheduled to return on January 28, 2019.

**ANSWER:** Mr. Smollett admits that he traveled to New York and was scheduled to return to Chicago on January 28, 2019, and otherwise denies the allegations in paragraph 22. Answering further, after learning that his flight to New York was delayed, Mr. Smollett walked across the street from his apartment building to NBC tower to appear via satellite on Al Sharpton's show to raise money for HBCU Bennett College; after the show, he walked back to his apartment and then went to the airport.

23.     On the evening of January 28, 2019, Defendant's flight into Chicago was delayed, and he called Abel telling him he needed to delay the staged attack, and Abel agreed.

**ANSWER:** Mr. Smollett admits that his January 28, 2019, flight to Chicago was delayed and that he called Abel to let him know of the delay because they were scheduled to have a personal training session together at 9:30 P.M.; otherwise Mr. Smollett denies the allegations in paragraph 23.

24.     Defendant's plane landed at Chicago O'Hare International Airport ("O'Hare") at 12:30 A.M., on January 29, 2019.

**ANSWER:** Mr. Smollett admits that his flight to O'Hare landed at approximately 11:45 P.M. on January 28, 2019, but he did not disembark the plane until closer to 12:30 A.M. on January 29, 2019.

25.     Cell phone records indicate that at 12:49 A.M., Defendant and Abel spoke by telephone. During this call, Defendant told Abel the attack should take place at 2:00 A.M. at the agreed-upon location. Minutes later, Ola ordered an Uber to pick the Osundairo Brothers up at their home.

**ANSWER:** Mr. Smollett admits that Abel Osundairo called him at approximately 12:49 A.M. on January 29, 2019, to reschedule their workout that evening to 9:30 A.M.

7

the following morning. Answering further, Mr. Smollett admits that between leaving New York and arriving to Chicago, Mr. Smollett was active on social media, posting updates regarding his flight delay and arrival status via his Instagram "stories" and in direct messages with his contacts. Mr. Smollet further admits that Abel called him after learning from social media that Mr. Smollett had finally landed back in Chicago, and instructed Mr. Smollett to eat four eggs prior to their workout session in the morning, per his nutrition plan. Mr. Smollett denies that he "told Abel the attack should take place at 2:00 A.M. at the agreed-upon location." Mr. Smollett lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 25, and therefore denies them.

26.     The Osundairo Brothers took an Uber to the 1400 block of North Wells, where they flagged down a taxi that took them to within three blocks of the agreed-upon location of the staged attack. The taxi's in-car video captures the Osundairo Brothers flagging the car and riding in the back seat.

**ANSWER:** Mr. Smollett lacks knowledge or information sufficient to admit or deny the allegations in paragraph 26, and therefore denies the allegations therein.

27.     From approximately 1:22 A.M. until approximately 2:03 A.M., video evidence shows the Osundairo Brothers on foot in an area bordered by Lake Shore Drive, Columbus Drive, Illinois Street, and the Chicago River.

**ANSWER:** Mr. Smollett lacks knowledge or information sufficient to admit or deny the contents of the alleged video evidence, and therefore denies the allegations in paragraph 27.

28.     Video evidence also shows Defendant returning to his Streeterville apartment at approximately 1:30 A.M.

**ANSWER:** Mr. Smollett lacks knowledge or information sufficient to admit or deny the contents of the alleged video evidence, and therefore denies the allegations in paragraph 28.

29.     At 1:45 A.M., Defendant left his building to walk to a nearby Subway restaurant at Illinois Street and McClurg Court.

**ANSWER:** Deny. Answering further, Mr. Smollett admits that he left his building around 1:45 A.M. to buy eggs from a nearby Walgreens; after discovering it was closed he went to Subway.

30.     At 2:00 A.M., surveillance video evidence shows the Osundairo Brothers waiting near New Street and North Water Street.

**ANSWER:** Mr. Smollett lacks knowledge or information sufficient to admit or deny the contents of the alleged video evidence, and therefore denies the allegations in paragraph 30.

31.     During an interview Defendant gave on ABC's Good Morning America, which aired on February 14, 2019, he positively identified the people shown in a still of this surveillance video (the "Still Photo") as his attackers.

**ANSWER:** Mr. Smollett admits that during an interview for Good Morning America, which aired on February 14, 2019, he identified the people shown in a still photo from a surveillance video as his attackers. Mr. Smollett lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 31, and therefore denies them.

32.     The two men in this Still Photo are the Osundairo Brothers.

**ANSWER:** Mr. Smollett lacks knowledge or information sufficient to admit or deny the allegations in paragraph 32, and therefore denies the allegations therein.

33.     Shortly after 2:00 A.M., the Osundairo Brothers staged their attack on Defendant.

**ANSWER:** Mr. Smollett admits that he was attacked shortly after 2:00 A.M. on January 29, 2019; he denies the allegation in paragraph 33 that the attack staged. Mr. Smollett lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 33, and therefore denies them.

34.     After the staged attack, the Osundairo Brothers ran from the location, flagged a taxi, and were dropped off near their home at approximately 2:25 A.M.

**ANSWER:** Mr. Smollett denies the allegation that the attack was staged. Mr. Smollett lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 34, and therefore denies them.

**C.  Defendant makes a false police report to the City.**

**ANSWER:** Deny.

35.     At 2:27 A.M., after Defendant told his manager, Frank Gatson, that he had been attacked, Gatson called the Chicago Police Department ("CPD") to report the incident as a bona fide attack on Defendant.

**ANSWER:** Mr. Smollett admits that he told his artistic director, Frank Gatson, who was staying with him at the time, that he had been attacked. He lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 35, and therefore denies them.

36.     At 2:42 A.M., CPD officers arrived at Defendant's apartment and found Defendant with a rope draped around his neck.

**ANSWER:** Admit.

37.     Defendant proceeded to make a false police report.

**ANSWER:** Deny.

38.     Defendant told CPD officers that he was the victim of a racist and homophobic physical attack.

**ANSWER:** Mr. Smollett admits that he told CPD officers that he had been physically attacked and that his attackers yelled racial and homophobic slurs at him.

39.     Defendant made this report to the CPD officers despite knowing that the purported attack was not for racist or homophobic motives, that his purported attackers were, in fact, his acquaintances, and that he had asked his purported attackers, the Osundairo Brothers, to stage the attack.

**ANSWER:** Deny.

40.     Defendant told the CPD officers that, during the attack, his purported attackers had placed a rope around his neck, poured a liquid chemical on him, and told him this is "MAGA Country."

**ANSWER:** Mr. Smollett admits that he told CPD officers that, during the attack, his attackers placed a rope around his neck, poured a liquid chemical on him, and told him

this is "MAGA Country"; otherwise, Mr. Smollett denies the characterization of his "purported attackers."

41.     Defendant did not tell the CPD officers that his attack was staged at his

direction and with the cooperation of the Osundairo Brothers.

**ANSWER:** Mr. Smollett denies the allegations of paragraph 41, including the question-begging presupposition. Answering further, Mr. Smollett denies that his attack was staged at his direction and with the cooperation of the Osundairo Brothers.

42.     Defendant told the CPD officers that the incident happened near a camera

that should have captured the attack. That is the same camera Defendant pointed out to the

Osundairo Brothers on January 27, 2019.

**ANSWER:** Deny. Answering further, Mr. Smollett admits that when CPD officers took him back to re-walk the scene of the crime, he then noticed, and pointed out to CPD officers, several surveillance cameras near the site where he was attacked.

43.     At no point did Defendant inform police that he knew his attackers or

recognized their appearance or voices.

**ANSWER:** Mr. Smollett denies the allegations of paragraph 43, including the question-begging presupposition. Answering further, Mr. Smollett denies that he recognized the appearance or voices of his attackers.

44.     Instead, Defendant misled the CPD officers when he described his attackers.

**ANSWER:** Deny.

45.     Defendant told the CPD officers that his primary attacker (now known to

be Abel) was wearing a ski mask that covered his entire face, with the exception of the area

around his eyes, by which Defendant could tell the attacker was white-skinned. Defendant

made this statement despite knowing that the Osundairo Brothers are not white-skinned.

**ANSWER:** Mr. Smollett admits that he told CPD officers that his primary attacker, the only one he saw from the front, was wearing a ski mask that covered his entire face, with the exception of the area around his eyes, by which he was able to see the color of the skin through that open area of the mask, which appeared to be white-skinned. Mr. Smollett further admits that the Osundairo Brothers are not white-skinned. Otherwise, Mr. Smollett denies the remaining allegations in paragraph 45.

46.     By providing this false description, Defendant purposely misled the CPD officers to believe that his attackers were white, when, in fact, Defendant knew that his attackers were the Osundairo Brothers.

**ANSWER:** Deny.

47.     Defendant and the Osundario [*sic*] Brothers continued to be in contact after the staged attack, including on January 29, 2019 at 7:45 P.M. and on January 30, 2019 at 10:46 A.M.

**ANSWER:** Mr. Smollett admits that he and Abel Osundairo were in contact on January 29, 2019, at around 7:45 P.M. and on January 30, 2019, at around 10:46 A.M., and otherwise denies the allegations in paragraph 47. Answering further, Mr. Smollett admits that detectives had asked for the phone numbers of Mr. Gatson, his personal trainer, his manager, and his assistant—the contacts that he had been in touch with leading up to the attack; after turning over the phone numbers of the foregoing individuals, Mr. Smollett contacted these individuals including Abel to let them know that the CPD would be contacting them. After a CPD spokesperson told the press on the morning of January 30, 2019, that the CPD could not corroborate Mr. Smollett's story, Mr. Smollett called numerous people including his manager and Abel to see if CPD detectives had reached out to them yet. They confirmed that CPD had not contacted them yet.

**D.  CPD investigates Defendant's false report at significant expense to the City.**

**ANSWER:** Deny.

48.     For the next two weeks, the CPD expended significant resources investigating Defendant's false report of a high-profile hate crime and physical assault. Over two dozen CPD officers and detectives participated in the investigation, ultimately spending weeks investigating Defendant's false statements. During the course of CPD's investigation into Defendant's false statements, CPD has incurred 1,836 overtime hours, which resulted in the City paying $130,106.15 in overtime pay as result of Defendant's false statements.

**ANSWER:** Mr. Smollett denies that he made a false report or false statements to CPD officers. Mr. Smollett lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 48, and therefore denies them.

49.     Eventually, after an extensive investigation using interviews, surveillance videos, Office of Emergency Management pod videos, in-car taxi camera videos, rideshare records, bank records, and a store receipt, CPD identified the Osundairo Brothers as the perpetrators of the alleged attack.

**ANSWER:** Mr. Smollett lacks knowledge or information sufficient to admit or deny the allegations in paragraph 49, and therefore denies the allegations therein.

50.     On February 13, 2019, the Osundairo Brothers returned from Nigeria. They were immediately and separately detained upon their arrival at O'Hare. CPD investigators thereafter obtained testimony and corroborating evidence from the Osundairo Brothers that showed Defendant had orchestrated and staged the attack with the cooperation of the Osundairo Brothers, and that Defendant's police report was false.

**ANSWER:** Mr. Smollett denies that he orchestrated and staged the attack with the cooperation of the Osundairo Brothers. Mr. Smollett lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 50, and therefore denies them.

51.     On February 14, 2019, CPD officers interviewed Defendant again about the Still Photo that he had said on Good Morning America showed his attackers. Defendant again stated that he was certain that the Still Photo depicted the men who had attacked him.

**ANSWER:** Mr. Smollett admits that upon being show the grainy, black and white still photo of two individuals, which CPD represented was taken from a surveillance camera near the place and time of the attack, he identified the individuals in the Still Photo as his attackers; otherwise, he denies the allegations in paragraph 51.

52.     CPD officers then told Defendant that the men in the Still Photo had been identified as the Osundairo Brothers.

**ANSWER:** Admit.

13

53.     Defendant made further false statements by claiming that his only relationship with the Osundairo Brothers was as trainers and social acquaintances, claiming that they could not have been his attackers.

**ANSWER:** Mr. Smollett admits that he told CPD officers that Abel Osundairo was his trainer and friend, and that Ola was Abel's brother, and that they could not have been his attackers. Mr. Smollett denies the remaining allegations in paragraph 53.

54.     During the February 14, 2019 interview, Defendant again failed to inform the CPD officers that he knew that the Osundairo Brothers were his attackers and that he had orchestrated the attack with the Osundairo Brothers' assistance.

**ANSWER:** Mr. Smollett denies the allegations of paragraph 54, including the question-begging presupposition.

**COUNT 1: Violation of the FSO**

55.     The City incorporates all preceding allegations as if they were set forth herein.

**ANSWER:** This is a statement incorporating Plaintiff's allegations in the preceding paragraphs, to which no response is required. To the extent a response is required, Mr. Smollett incorporates his responses to the preceding paragraphs.

56.     Subsection 1-21-010(a) of the FSO provides that:

> [a]ny person who knowingly makes a false statement of material fact to the city in violation of any statute, ordinance or regulation, or who knowingly makes a false statement of material fact to the city in connection with any application, report, affidavit, oath, or attestation, including a statement of material fact made in connection with a bid, proposal, contract or economic disclosure statement or affidavit, is liable to the city for a civil penalty of not less than $500.00 and not more than $1,000.00, plus up to three times the amount of damages which the city sustains because of the person's violation of this section. A person who violates this section shall also be liable for the city's litigation and collection costs and attorneys' fees.

MCC § 1-21-010(a).

**ANSWER:** This paragraph consists of a legal conclusion, to which no response is required.

14

57.     Subsection 1-21-010(d) of the FSO provides that:

[f]or the purposes of Chapter 1-21 of this Code, a person knowingly makes a false statement of material fact when that person (i) makes a statement of material fact with actual knowledge that the statement was false, or (ii) makes a statement of material fact with knowledge of facts or information that would cause a reasonable person to be aware that the statement was false when it was made, or iii) signs, certifies, attests, submits or otherwise provides assurances, or causes any other person to sign, certify, attest, submit or otherwise provide assurances, that a statement of material fact is true or accurate in deliberate ignorance or reckless disregard of the truth or falsity of the statement. For purposes of this section, a person who fails to make a reasonable investigation to determine the accuracy, truthfulness or completeness of any material fact acts in deliberate ignorance or reckless disregard of the truth or falsity of the material fact.

MCC § 1-21-010(d).

**ANSWER:** This paragraph consists of a legal conclusion, to which no response is required.

58.     Defendant knowingly made numerous false statements of material fact in violation of the FSO.

**ANSWER:** Deny.

59.     Defendant knowingly made numerous false statements of material fact to CPD officers, including when he made a police report alleging that he was the victim of a racist and homophobic attack, when he knew that he had staged the attack with the assistance of the Osundairo Brothers.

**ANSWER:** Deny.

60.     In addition, when presented with evidence that his statements were false, Defendant again refused to inform CPD officers that he knew the Osundairo Brothers were his attackers, and that he had orchestrated his staged attack with them.

**ANSWER:** Mr. Smollett denies the allegations of paragraph 60, including the question-begging presupposition. Answering further, Mr. Smollett admits that the CPD never presented him with any evidence that any of his statements were false.

61. Because of Defendant's false statements, the City expended significant resources and manpower, including, but not limited to, $130,106.15 in CPD overtime pay that the City paid solely due to Defendant's false statements.

**ANSWER:** Mr. Smollett denies the allegations that he made false statements. Mr. Smollett lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 61, and therefore denies them.

62. Defendant is liable to the City for a $1,000 civil penalty for each false statement he made to the City, in addition to three times the amount of the damages that the City sustained, as well as litigation and collection costs, and attorneys' fees.

**ANSWER:** This paragraph consists of a legal conclusion, to which no response is required. To the extent a response is required, Mr. Smollet denies the allegations in paragraph 62.

WHEREFORE, the City respectfully requests that the Court:

A.     Find Defendant liable for violating the FSO;

B.     Fine Defendant a civil penalty of $1,000 for each false statement he made to the City;

C.     Enter judgment against Defendant and in favor of the City for the civil penalties assessed, and trebled damages in an amount to be proven at trial (which includes, but is not limited to, overtime compensation paid by the City) incurred by the City because of Defendant's false statements;

D.     Order Defendant to pay the City's reasonable attorneys' fees and costs; and

E.     Award such further relief as this Court deems just and equitable.

**ANSWER:** This paragraph constitutes Plaintiff's request for relief to which no response is required. To the extent a response is required, Mr. Smollett denies that Plaintiff is entitled to the relief sought.

## COUNT 2: Violation of the CRO

63. The City incorporates all preceding allegations as if they were set forth herein.

**ANSWER:** This is a statement incorporating Plaintiff's allegations in the preceding paragraphs, to which no response is required. To the extent a response is required, Mr. Smollett incorporates his responses to the preceding paragraphs.

64.     The CRO provides that "[a]ny person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law, or such person's failure to correct conditions which violate any federal, state or local law when such person was under a legal duty to do so, shall be liable to the city for those costs." MCC § 1-20-020.

**ANSWER:** This paragraph consists of a legal conclusion, to which no response is required.

65.     Under the CRO, "'costs' includes all costs of the city incurred in relation to the provision of services by the city or its agents, regardless of whether the city would have otherwise incurred those costs, including but not limited to wages and benefits of personnel involved in providing such services, reasonable costs of equipment used in the provision of such services, costs of materials expended in providing such services, costs of storing hazardous or any other materials recovered during the course of providing such services, or any other costs allocable to the provision of services." MCC § 1-20-010.

**ANSWER:** This paragraph consists of a legal conclusion, to which no response is required.

66.     In addition, "[i]n any action brought under [the CRO], the City of Chicago shall also be entitled to recover a penalty in an amount equal to the city's litigation and collection costs and attorney's fees." MCC § 1-20-060.

**ANSWER:** This paragraph consists of a legal conclusion, to which no response is required.

67.     The City is entitled to recovery of the costs of necessary services provided by the City in order to provide services in investigating and responding to Defendant's violations of the MCC, together with its litigation and collection costs and attorney's fees.

**ANSWER:** This paragraph consists of a legal conclusion, to which no response is required. To the extent a response is required, Mr. Smollett denies the allegations in paragraph 67.

WHEREFORE, the City respectfully requests that the Court:

A.     Find that the City incurred necessary costs investigating and responding to Defendant's statements made in violation of the MCC;

B.     Order Defendant to pay the City's response costs in an amount to be proven at trial;

C.     Order Defendant to pay the City a penalty in amount equal to the City's litigation and collection costs and attorney's fees; and

D.     Award such further relief as this Court deems just and equitable.

**ANSWER:** This paragraph constitutes Plaintiff's request for relief to which no response is required. To the extent a response is required, Mr. Smollett denies that Plaintiff is entitled to the relief sought.

## **AFFIRMATIVE DEFENSES**

### **FIRST AFFIRMATIVE DEFENSE**
### **(Accord and Satisfaction)**

68.     The City is not entitled to recover further costs for services provided by the City in investigating and responding to Mr. Smollett's police report because it has already collected $10,000 from Mr. Smollett. Having agreed to accept $10,000 from Mr. Smollett as payment in full in connection with the dismissal of the charges against him, the City cannot seek additional recovery from Mr. Smollett under the doctrine of accord and satisfaction.

**SECOND AFFIRMATIVE DEFENSE**
**(Waiver)**

69.     The City has waived any right to recover further costs for services provided by the City in investigating and responding to Mr. Smollett's police report because it has already accepted $10,000 from Mr. Smollett. Having agreed to accept $10,000 from Mr. Smollett in connection with the dismissal of the charges against him, the City has waived its right to seek additional recovery from Mr. Smollett under the doctrine of waiver.

**THIRD AFFIRMATIVE DEFENSE**
**(Equitable Estoppel Under Illinois Law)**

70.     The City is equitably estopped from seeking to recover further costs for services provided by the City in investigating and responding to Mr. Smollett's police report. By its conduct and agreement to accept the $10,000 from Mr. Smollett, the City induced Mr. Smollet, to his detriment, to rely on that conduct as satisfying any amount that Mr. Smollett may be required to pay the City in connection with Mr. Smollett's police report. The City then violated this agreement by bringing a civil claim against Mr. Smollet. Due to this misrepresentation, the City should not be entitled to receive any additional compensation from Mr. Smollett.

**FOURTH AFFIRMATIVE DEFENSE**
**(Unclean Hands Under Illinois Law)**

71.     The City is barred from seeking to recover costs for services provided by the City in investigating and responding to Mr. Smollett's police report due to its inequitable conduct in filing criminal charges against Mr. Smollett without probable cause and maliciously prosecuting him in bad faith.

## COUNTERCLAIM

For his counterclaim against Counterclaim-Defendants City of Chicago, Chicago Police Department (hereafter "CPD") detective Michael Theis, CPD Detective Commander Edward Wodnicki, CPD Superintendent Eddie Johnson, John and Jane Doe Defendants 1-10, Abimbola ("Abel") Osundairo, and Olabinjo ("Ola") Osundairo, Defendant and Counterclaim-Plaintiff Jussie Smollett states as follows:

## PARTIES

1.      On information and belief, Counterclaim-Defendant City of Chicago (hereafter "City") is a municipality duly incorporated under the laws of the State of Illinois and is the employer of CPD Superintendent Eddie Johnson, Detective Commander Edward Wodnicki, Detective Michael Theis, and John and Jane Doe Defendants 1-10. The City is responsible for the policies, practices and customs of CPD and its employees.

2.      On information and belief, Counterclaim-Defendant Michael Theis is a resident of the city of Chicago, Illinois, a citizen of Illinois, and a CPD detective.

3.      Counterclaim-Defendant CPD Commander of the Area Central Detective Division Edward Wodnicki is a resident of the city of Chicago, Illinois, a citizen of Illinois.

4.      Counterclaim-Defendant CPD Superintendent Eddie Johnson is a resident of the city of Chicago, Illinois, a citizen of Illinois.

5.      On information and belief, Counterclaim-Defendants John and Jane Does 1-10 are individuals that are CPD employees and Illinois citizens whose names and addresses of residence are unknown at this time.

6.      On information and belief, Counterclaim-Defendant Ola Osundairo is a resident of the city of Chicago, Illinois and a citizen of Illinois.

7.    On information and belief, Counterclaim-Defendant Abel Osundairo is a resident of the city of Chicago, Illinois and a citizen of Illinois.

8.    Defendant and Counterclaim-Plaintiff Jussie Smollett is a citizen of the state of California.

## JURISDICTION AND VENUE

9.    The Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Counterclaim-Plaintiff and the Counterclaim-Defendants and the matter in controversy between Counterclaim-Plaintiff and each Counterclaim-Defendant exceeds $75,000, exclusive of interest and costs.

10.    The Court has personal jurisdiction over Counterclaim-Defendants City of Chicago, Michael Theis, Edward Wodnicki, Eddie Johnson, John and Jane Doe Defendants 1-10, Abel Osundairo, and Ola Osundairo on the basis of, *inter alia*, their contacts with Illinois.

11.    Venue is proper in this district under 28 U.S.C. § 1391 because all the conduct complained of herein occurred in this district.

## BACKGROUND

12.    On or about January 22, 2019, Mr. Smollett received an envelope delivered to the Fox production studio at 1445 S. Rockwell Street in Chicago, which contained a racist and homophobic death threat. The letter included a stick figure pointing a gun at another figure's head and indicated that the latter figure represented Mr. Smollett. In addition, the envelope contained a white powdery substance.

13.     Shortly after 2:00 A.M. on January 29, 2019, Mr. Smollett was physically attacked by masked men outside his apartment building in the Streeterville neighborhood of Chicago. The men yelled racist, homophobic, and political slurs at Mr. Smollett, poured bleach on him, and hung a noose around his neck.

14.     Mr. Smollett only saw the front of his primary attacker, who was wearing a balaclava-style mask that covered the entire face except for the area around the eyes and the bridge of the nose, from which Mr. Smollett saw that the attacker was white-skinned.

15.     After the attack, Mr. Smollett returned to his apartment and encountered his artistic director, Frank Gatson, who was staying with him at the time. When Mr. Gatson learned that Mr. Smollett had been attacked, he urged Mr. Smollett to call the police. Because Mr. Smollett was reluctant to do so due to privacy concerns, Mr. Gatson called 911 himself.

16.     When CPD officers arrived at the scene, Mr. Smollett truthfully told them the details of the attack and cooperated in all respects with their investigation. Mr. Smollett asked the responding officers to turn off their body cameras in an effort to maintain his privacy.

17.     When Mr. Smollett told CPD officers that one of the attackers yelled "This is MAGA country!" before running away from the scene of the attack, Mr. Smollett noticed that the CPD officers became visibly uncomfortable.

18.     In the weeks that followed, the CPD represented to Mr. Smollett that he was being treated as the victim of a crime.

19.     Over the course of the CPD's investigation into the attack on Mr. Smollett, led by Detective Commander Wodnicki, however, the CPD began to anonymously

disseminated false and misleading information about the investigation and the evidence to the media, painting a false picture of the incident and causing public disbelief of Mr. Smollett's statements. A CPD spokesperson later acknowledged "that a lot of the information out there was inaccurate." (*See* https://abc7ny.com/cpd-opens-internal-investigation-into-smollett-investigation-leaks/5175569/.)

20.     The extent of the leaks caused CPD to announce that it was conducting an internal investigation to determine the source of the leaks (although to date no one has been publicly identified and no CPD personnel have been disciplined for releasing information about the case).

21.     Based on the false and misleading information CPD disseminated, in early February 2019, the media began to report that the attack on Mr. Smollett may have been a "hoax" orchestrated by Mr. Smollett.

22.     In the face of intense public scrutiny that the attack was a hoax orchestrated by Mr. Smollett, he agreed to be interviewed by Robin Roberts on ABC's "Good Morning America" to address questions about the attack. Mr. Smollett's interview with Ms. Roberts aired on February 14, 2019.

23.     Also on February 14, 2019, the CPD arrested Abel Osundairo and Ola Osundairo (collectively the "Osundairo Brothers"), upon their arrival at O'Hare International Airport from Nigeria, for perpetrating the attack on Mr. Smollett.

24.     At the time the Osundairo Brothers were arrested by CPD, Abel had known Mr. Smollett for less than two years, and Ola had only met Mr. Smollett on limited occasions. Furthermore, CPD officers knew that Ola had previously been charged with

attempted murder in a 2011 stabbing that occurred near his home in Chicago, and that he had a felony conviction for aggravated battery arising from that incident.

25.     Despite their attenuated connection to Mr. Smollett, Ola's prior criminal record, and the substantial criminal exposure they faced for perpetrating a hate crime, the Osundairo Brothers did not claim that the attack was a hoax for almost two entire days while they were detained in police custody.

26.     On the contrary, the Osundairo Brothers initially denied being involved in the attack and expressed surprise that they were persons of interest.

27.     Specifically, on February 15, 2019, the Osundairo Brothers' attorney, Gloria Schmidt, told news outlets that her clients were "really baffled why they are people of interest. They really don't understand how they even got information that linked them to this horrific crime. But they're not guilty of it. They know that the evidence is going to prove them innocent. They send their best to Jussie." (*See* https://www.nytimes.com/ 2019/02/15/arts/television/smollett-suspects.html.)

28.     Ms. Schmidt also said: "It's an awful thing that happened to Jussie, but it's not my guys." (*See* https://www.thedailybeast.com/lawyer-brothers-dont-know-why-theyre-persons-of- interest-in-reported-jussie-smollett-attack.) She added: "When they first learned about what happened to him they were horrified. This is someone they know. This is someone they've worked with, so they don't want to see somebody go through that." (*See* https://chicago.cbslocal.com/2019/02/15/suspects-arrested-in-jussie-smollett-case/.)

29.     When the CPD took the Osundairo Brothers into custody, they were legally only able to hold them for 48 hours before either releasing them or charging them with a crime.

30.     On information and belief, for the first 47 hours that CPD interrogated the Osundairo Brothers, they maintained that they were not involved in the attack on Mr. Smollett. During this lengthy period of interrogation, the Osundairo Brothers never alleged that Mr. Smollett had orchestrated the attack on himself.

31.     Indeed, while the CPD was holding the Osundairo Brothers for their interrogation, the CPD, including John and Jane Doe Defendants, contacted Mr. Smollett through his attorney and asked him to come in and sign a criminal complaint against the Osundairo Brothers for the attack on Mr. Smollett.

32.     Because Mr. Smollett did not know the Osundairo Brothers were involved in the attack on him, Mr. Smollett asked if CPD would show him any evidence that the Osundairo Brothers perpetrated the attack on him.

33.     The CPD, however, told Mr. Smollett that they would not show him any evidence that the Osundairo Brothers attacked him.

34.     Because Mr. Smollett had no knowledge or basis to believe that the Osundairo Brothers attacked him—including the fact that his primary attacker was white skinned—he declined to sign a criminal complaint against them.

35.     In the interim, Ms. Schmidt claimed to have "pieced together" a timeline based on the evidence and shown the Osundairo Brothers a video of Mr. Smollett's interview on "Good Morning America" in which he detailed the attack. It was only then that the Osundairo Brothers said that they attacked Mr. Smollett.

36.     Specifically, at or near the time when the CPD was required to charge or release them, and after consultation with Ms. Schmidt, the Osundairo Brothers changed their story and falsely told police that not only had they been involved in the attack on Mr. Smollett, but that the attack was a hoax orchestrated by Mr. Smollett.

37.     CPD Superintendent Eddie Johnson explained the sudden change in the Osundairo Brothers' story on an appearance on ABC's "Good Morning America" with Robin Roberts on February 25, 2019:

> JOHNSON:     The 47th hour that we had those two individuals in custody is when it changed.
>
> ROBERTS:     What, what changed in that, that 47th hour?
>
> JOHNSON:     So we had gathered up a lot of evidence and facts before then.  But what changed was that they then became cooperating witnesses.
>
> ROBERTS:     And was there a reason why they became in the 47th hour that they decided to do that?
>
> JOHNSON:     Well, you know we worked very closely with their lawyer and ***their lawyer went in there and talked to them and whatever she said to them apparently got through to them*** to just tell the truth about what happened and that's what they decided to do.

(Full interview *available at* https://abcnews.go.com/GMA/News/video/chicago-police-chief-speaks-jussie-smollett-case-61294750) (emphasis added).

38.     The CPD, including Detective Commander Wodnicki, Detective Theis, and John and Jane Doe Defendants, took unorthodox steps in violation of protocol in order to obtain statements from the Osundairo Brothers and close the investigation.

39.     On information and belief, the standard protocol directs that different individuals under interrogation for the same crime are questioned and provide statements separately.

40.     Here, however, although Abel and Ola were under investigation for the same offense, the CPD, including Detective Commander Wodnicki, Detective Theis, and John and Jane Doe Defendants, allowed Ola to be present while Abel was being interviewed by CPD officers to make Abel more comfortable, compromising the integrity of the questioning and allowing the Osundairo Brothers further opportunity to coordinate their fabricated statements.

41.     The Osundairo Brothers were released from police custody without any charges being filed against them, even though they implicated themselves in wrongdoing.

42.     On information and belief, the CPD told the Osundairo Brothers that they would go free if they implicated Mr. Smollett.

43.     The "eleventh hour" change in the Osundairo Brothers' story, stating that they had been involved in the attack on Mr. Smollett, and that the attack was a hoax orchestrated by Mr. Smollett, was false and self-serving to avoid criminal charges being filed against them, which was clearly not reliable.

44.     Nonetheless, and without any independent corroboration, the CPD, including Detective Commander Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, sought have Mr. Smollett prosecuted based on the Osundairo Brothers' false, self-serving, and unreliable statements in order to close the investigation into the attack on Mr. Smollett.

45.     In furtherance of closing the investigation, CPD officers, including Detective Commander Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, sought to promptly "lock in" the Osundairo Brothers' statements under oath.

46.     On February 20, 2019, the Osundairo Brothers testified before a grand jury that had been convened in the Circuit Court of Cook County, falsely stating under oath that the attack on Mr. Smollett was a hoax which he himself had orchestrated.

47.     Based on the false statements and unreliable testimony by the Osundairo Brothers, on February 21, 2019, a felony complaint was filed against Mr. Smollett in the Circuit Court of Cook County, alleging one count of disorderly conduct, for filing a false police report, in violation of Chapter 720, Act 5, Section 26-1(a)(4) of the Illinois Compiled Statutes Act of 1992, as amended.

48.     The felony complaint was signed by CPD Detective Michael Theis.

49.     Weeks later, on March 7, 2019, based upon false information, a felony indictment was returned against Mr. Smollett in the Circuit Court of Cook County, case number 19 CR 3104, alleging 16 counts of disorderly conduct, namely filing a false police report in violation of Chapter 720, Act 5, Section 26-1(a)(4) of the Illinois Compiled Statutes Act of 1992, as amended.

50.     The indictment was returned against Mr. Smollett based on the false testimony of Detective Theis before the grand jury.

51.     Detective Theis based his grand jury testimony on the Osundairo Brothers' false and clearly unreliable statements.

***The Osundairo Brothers and Gloria Schmidt, Conspire to Falsely Advance the Hoax Narrative, Resulting in the Malicious Prosecution of Mr. Smollett.***

52.     To this day, Mr. Smollett does not know what involvement, if any, the Osundairo Brothers had in the attack on him on January 29, 2019.

53.     It is clear, however, that the Osundairo Brothers faced prosecution by the CPD for the attack, and they decided with Gloria Schmidt to advance the false hoax narrative to avoid criminal charges.

54.     Before the CPD questioned the Osundairo Brothers in mid-February, the news media had widely reported the hoax narrative.

55.     In the face of this narrative, the CPD's investigation revealed that the internet search history of one of the Osundairo Brothers showed that while they were in Nigeria, the Osundairo Brothers were reading numerous stories about the Smollett investigation, including the following articles:

> 2/8/2019 10:28:14PM (UTC+0) - Chicago PD Intend to Charge Jussie Smollett If a False Report Was Filed
>
> 2/10/2019 8:46:56PM (UTC +0) - Jussie Smollett noose news, by Steve Sailer - The Unz Review (discussing some "of the most publicized hate hoaxes")
>
> 2/10/2019 8:52:54PM (UTC +0) - Jussie Smollett To Be "Held Accountable" For Potential False Report, Police Claims

56.     The CPD perpetuated the hoax narrative by formally calling attention to it. On February 14, 2019—prior to the Osundairo Brothers' false statements to the police that the attack was a hoax—CPD spokesperson Anthony Guglielmi issued a public statement through his Twitter account, stating: "Media reports anout [*sic*] the Empire incident being a hoax are unconfirmed by case detectives. Supt Eddie Johnson has contacted @ABC7Chicago to state on the record that we have no evidence to support their reporting and their supposed CPD sources are uninformed and inaccurate."

57.     By the time the Osundairo Brothers were detained for interrogation, the hoax narrative had been widely reported and Ms. Schmidt capitalized on this.

58.     In numerous television and radio interviews, Ms. Schmidt later admitted that she came up with the story that allowed the Osundairo Brothers to be released from police custody uncharged and resulted in the CPD filing a felony complaint against Mr. Smollett.

59.     For instance, in a television interview on CNN on March 11, 2019, Ms. Schmidt told Anderson Cooper that it was actually she and her co-counsel who "pieced everything together," referring to the narrative the Osundairo Brothers told CPD in the last hour of their interrogation. She explained:

> Number one, I want to just put it out there that [the Osundairo Brothers] fully cooperated with the police. Obviously that starts with cooperating with your attorney. And myself, my co-counsel, Jorge Rodriguez, we walked through the actual timeline. We pieced everything together. This took us a lot of time ourselves. So my own law firm doing our own private investigation. We were able to, to fish it out, if you will, and tell the Commander there's something that doesn't match with the narrative that had been put out by Mr. Smollett.

(Full interview *available at* https://www.facebook.com/ watch/?v=526875264504960.)

60.     In a television interview which aired on Fox32 Chicago on March 11, 2019, Ms. Schmidt also took the untenable position that the Osundairo Brothers' "cooperation" with police was entirely selfless and not motivated in any way by their desire to avoid criminal charges. (Full interview *available at* https://www.facebook.com/ Fox32Chicago/posts/gloria-schmidt-the-attorney-for-the-osundairo-brothers-who-allegedly-helped-juss/10157819710 633797/.)

61.     In a radio interview, which aired on WGN Radio on March 27, 2019, Ms. Schmidt affirmed that the Osundairo Brothers' statements to police that they were acting at Mr. Smollett's direction shifted the trajectory of the investigation to Mr. Smollett and allowed the Osundairo Brothers to be released from police custody uncharged.

62.     During that interview, Ms. Schmidt stated:

And at the end of the day, it was thanks to that cooperation that the trajectory of their investigation switched. Remember, my clients were persons of interest at the start. Then they became suspects. They were arrested. Then they went home. And obviously that shift is because of the evidence that came to light and it was because this was something that was at Mr. Smollett's direction. So I can't speak for Mr. Smollett but obviously that is the key difference in making the investigation shift towards Mr. Smollett.

(Full interview *available at* https://wgnradio.com/2019/03/27/jussie-smollett-alleged-attackers-attorney-gloria-schmidt-im-quite-surprised-at-how-nefarious-people-think-this-case-is/.)

63.     Furthermore, in another radio interview on Chicago's Morning Answer (AM560), which aired on March 29, 2019, Ms. Schmidt admitted that she was the one who told the Osundairo Brothers the details of the attack and that she convinced the Osundairo Brothers to tell police that the attack was a hoax. (Full interview *available at* https://www.youtube.com/watch?v= CS8xuU4DxDM.)

64.     Significantly, other than the Osundairo Brothers' self-serving and fabricated statements, which contradicted their earlier statements and resulted in their release from custody with no criminal charges being filed against them, not a single piece of credible evidence independently corroborated their claim that the attack was a hoax.

65.     But notwithstanding these glaring deficiencies, which show the Osundairo Brothers' statements were not reliable, the CPD closed the investigation; instead, charges were promptly filed against Mr. Smollett, and the CPD and other City officials publicly shamed and condemned him.

***Superintendent Johnson's False Statements Regarding the So-Called "Evidence"
Against Mr. Smollett Demonstrate the CPD Lacked Probable Cause to Arrest and
Charge Mr. Smollett with Filing a False Police Report.***

66.     On February 21, 2019, Superintendent Eddie Johnson held a press
conference to address the arrest of Mr. Smollett. During that press conference,
Superintendent Johnson expressed outrage, stating that "Jussie Smollett took advantage of
the pain and anger of racism to promote his career." He also stated that the attack on Mr.
Smollett was a "publicity stunt" and a "phony attack," "choreographed by an actor [Mr.
Smollett]."

67.     Superintendent Johnson continued: "First, Smollett attempted to gain
attention by sending a false letter that relied on racial, homophobic, and political language.
When that didn't work, Smollett paid 3,500 dollars to stage this attack . . . ." "This stunt
was orchestrated by Smollett because he was dissatisfied with his salary, so he concocted
a story about being attacked." Superintendent Johnson also stated that Mr. Smollett "put
the national spotlight on Chicago for something that is both egregious and untrue."

68.     Superintendent Johnson repeated these allegations in several television
interviews on February 25, 2019. However, as Superintendent Johnson knew or should
have known, each of his statements about the key "evidence" against Mr. Smollett were
baseless and false.

69.     First, Fox executives and producers explicitly rejected the notion that Mr.
Smollett was dissatisfied with his salary, which Superintendent Johnson falsely presented
as the predicate for allegedly staging the attack. In fact, neither Superintendent Johnson
nor any other CPD officers even interviewed any Fox executives or producers, or Mr.
Smollett's agent or manager, to find out whether Mr. Smollett was dissatisfied with his
salary, as Johnson falsely claimed.

70.     Second, following Superintendent Johnson's February 21, 2019, press conference, the FBI promptly disputed Superintendent Johnson's assertion that Mr. Smollett sent himself the threatening letter. (*See* FEDS DISPUTE POLICE SUPERINTENDENT... Not Certain Jussie Wrote Letter (Feb. 22, 2019), *available at* https://www.tmz.com/2019/02/22/jussie-smollett-letter-police-chief-superintendent-fbi/.)

71.     On the contrary, Mr. Smollett has fully cooperated with the FBI investigation. In early March 2019 he voluntarily provided his DNA sample and fingerprints to agents.

72.     Mr. Smollett has not been charged by any agency for having sent himself the threatening letter, as Superintendent Johnson falsely claimed.

73.     Third, Ms. Schmidt, the Osundairo Brothers' attorney, confirmed in multiple interviews that the $3,500 check paid by Mr. Smollett to Abel Osundairo, was, in fact, for training and nutrition, not for the staged attack, as Johnson falsely claimed. This is consistent with the memo line of the check, which read, "5 week Nutrition/Workout program (Don't Go Video)," and is corroborated by numerous text messages the CPD obtained in which Mr. Smollett and Abel discuss training and nutrition during the relevant time period.

74.     In addition, during the same press conference Superintendent Johnson said that one of the Osundairo Brothers had spoken with the actor on the phone about an hour after the attack.

75.     But the telephone records the CPD had obtained showed that Mr. Smollett's next phone call with Abel was actually about 18 hours after the attack. When asked about

this inconsistency, CPD spokesperson Anthony Guglielmi said that Superintendent Johnson had "misspoken."

76.     Superintendent Johnson also stated that "[t]he [Osundairo] brothers had on gloves during the staged attack where they punched him a little bit, but as far as we can tell the scratches and bruising that you saw on his face was most likely self-inflicted."

77.     However, Superintendent Johnson had no basis for that statement. On the contrary, CPD officers knew that the doorman at Mr. Smollett's building who saw Mr. Smollett immediately after the attack reported that he had scratches and bruising on his face.

78.     Superintendent Johnson's demonstrably baseless and false public statements regarding the purported key "evidence" against Mr. Smollett demonstrate malice and a lack of good faith in prosecuting Mr. Smollett.

***The CPD Intentionally Ignored Evidence that Undercut the Hoax Narrative to Close the Investigation and Prosecute Mr. Smollett.***

79.     The CPD, including Detective Commander Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, knew or should have known that the Osundairo Brothers' uncorroborated, self-serving statements were not reliable.

80.     As detailed above, the CPD knew that its case against Mr. Smollett relied entirely on the uncorroborated and self-serving statements of the Osundairo Brothers.

81.     In addition, the CPD possessed substantial evidence which supported Mr. Smollett's account of the attack and undercut the Osundairo Brothers' story that the attack was a hoax, which CPD officers, including Detective Commander Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, ignored so that they could close the investigation by maliciously prosecuting Mr. Smollett.

82.     The text messages obtained by the CPD included one significant text message from Abel to Mr. Smollett sent around noon on January 29, 2019 (about 10 hours after the attack and after news of the attack had been made public), in which Abel wrote: "Bruh say it ain't true, I'm praying for speedy recovery. Sh[*]t is wild."

83.     It is significant that in none of their statements to police did the Osundairo Brothers claim that Mr. Smollett told them to send such a text after the attack or otherwise claim that this text was pretextual.

84.     This text message directly contradicted the Osundairo Brothers' statements that the attack was a hoax which Mr. Smollett had orchestrated. The CPD, however, ignored this critical evidence because it undercut the Osundairo Brothers' hoax narrative.

*CPD ignores the context of the "on the low" text message, which clearly shows that it was unrelated to the attack on Mr. Smollett.*

85.     While most of the text messages between Mr. Smollett and Abel during the relevant time period discuss training and nutrition, there was a single text message that, out of context, was susceptible to an incriminating interpretation.

86.     On January 25, 2019, during a text message conversation about Mr. Smollett's meal plan and his projected fat loss, Mr. Smollett asked Abel to meet face to face so that he could ask him to get him the herbal steroids while in Nigeria.

87.     In a text message from Mr. Smollett to Abel on January 25, 2019, Mr. Smollett asked Abel when he was leaving on his upcoming trip to Nigeria. After Abel responded that he and Ola were leaving for Nigeria on the evening of January 29, 2019, Mr. Smollett texted Abel stating: "Might need your help on the low. You around to meet up and talk face to face?"

88.     The Osundairo Brothers falsely told CPD officers that this text message was Mr. Smollett's initial communication to enlist the help of Abel and his brother to stage an attack on him.

89.     In fact, however, Mr. Smollett's text message was sent to enlist the help of his personal trainer to obtain herbal steroids in Nigeria to help him lose weight.

90.     Specifically, when Mr. Smollett first spoke to Abel about the training/nutrition plan and his desire to lose about 20 pounds for his upcoming music video shoot, Abel told him that there are herbal steroids which are banned in the United States but which he could get in Nigeria which would help Mr. Smollett shed weight fast.

91.     The internet search history of one of the Osundairo Brothers obtained by the CPD shows numerous search queries on January 25 and 27, 2019, for herbal steroids and banned bodybuilding substances.

92.     That search history from the time period in question, which CPD obtained, demonstrates that not only were the Osundairo Brothers interested in steroids and steroid alternatives to aid in losing weight and increasing muscle mass, but they were also specifically interested in what substances were banned in the United States two days before their trip to Nigeria.

93.     Considered in the context of the other text messages regarding macronutrients and projected fat loss, the only reasonable conclusion is that Mr. Smollett's text message about meeting "on the low" concerned banned steroids which Abel could obtain for him in Nigeria.

*CPD ignores the Osundario Brothers' text messages evidencing homophobic animus that motivated them to attack Mr. Smollett.*

94.     CPD officers also obtained text messages by Abel and Ola Osundairo demonstrating a strong homophobic sentiment by both brothers only a few weeks before the attack on Mr. Smollett.

95.     CPD officers recognized the significance of these messages during their investigation, as evidenced by the marking of asterisks next to the homophobic text messages with handwritten notations on the top of these pages as to the "gay references."

96.     The CPD, including Detective Commander Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, however, ignored this evidence because it undercut the Osundairo Brothers' hoax narrative.

*CPD ignores the evidence and statements from two independent witnesses indicating that a young white male was involved in the attack.*

97.     The CPD, including Detective Commander Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, were also aware that two independent witnesses both identified a young white male near the scene of the attack during the relevant time period.

98.     One of the independent witnesses saw a suspicious white male lingering outside Mr. Smollett's building carrying a rope shortly before the attack. The second independent witness told CPD officers that he saw ***a white male in a ski mask*** leaving the scene of the attack—the same description that Mr. Smollett gave of his primary attacker.

99.     Specifically, that witness, who was working as a Loss Prevention Agent for the nearby Sheraton Grand Hotel, told CPD officers that he saw two men in dark clothing

run past him at approximately 2:00 A.M. The witness told officers that the one he got a better look at was wearing all black with a hood or hat and a facemask.

100. That witness also told CPD officers that when he shined his flashlight at the individual's face, he "could only see the skin area near the male's eyes where the facemask had cutouts, and believed the male to be white, in his 20s."

101. CPD officers also noted that in a subsequent photo lineup conducted at the police station, the witness's attention was drawn to the individual who had the lightest colored skin compared to the other individuals in the lineup.

102. The CPD, including Detective Commander Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, ignored this critical evidence because it undercut the Osundairo Brothers' hoax narrative and would not allow the CPD to conclude its investigation.

103. Furthermore, the CPD possessed additional evidence demonstrating that the Osundairo Brothers lied to them and that they were acting with at least one other person who was not Mr. Smollett.

*CPD ignores additional evidence they obtained that shows that the Osundairo Brothers' statements were not reliable and that they were acting in concert with another individual at the time of the attack who was not Mr. Smollett.*

104. The Osundairo Brothers told CPD officers that Mr. Smollett instructed them not to bring their cell phones with them to the attack and that they complied.

105. However, the CPD obtained statements from two other independent witnesses who both contradicted the Osundairo Brothers' claim that they did not bring cell phones with them to the attack.

106.     Specifically, the Uber driver who picked up the Osundairo Brothers from their home at around 1:00 A.M. on January 29, 2019, told CPD officers that one of the riders in the vehicle "received a phone call while inside his vehicle and stayed on the phone most of the ride."

107.     Similarly, the Yellow Cab driver who, according to the CPD, drove the Osundairo Brothers after the attack specifically told CPD officers that at least one of the brothers had a cell phone that night, noting that "he saw the person on the passenger side on a cell phone 'only text no talk.'"

108.     The CPD possessed Mr. Smollett's telephone records demonstrating that he was not in communication with the Osundairo Brothers during this time period.

109.     Although CPD officers, including Detective Commander Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, were aware that the Osundairo Brothers lied to them and were acting with at least one other person who was not Mr. Smollett, they ignored this evidence because it undercut the Osundairo Brothers' hoax narrative.

110.     These inconsistencies and loose ends in the Osundairo Brothers' story also further demonstrate that the Osundairo Brothers' statements to the CPD were not reliable.

***Counter-Defendants' Conduct Has Caused and Continues to Cause Mr. Smollett Substantial Harm.***

111.     On March 26, 2019, the Cook County State's Attorney's Office moved to dismiss all 16 counts against Mr. Smollett. The court granted the motion and dismissed the case.

112.     Despite the dismissal of all charges against Mr. Smollett, the CPD's prosecution of Mr. Smollett based on the Osundairo Brothers' false statements about the

attack has caused Mr. Smollett to be the subject of mass public ridicule and harm to him personally.

113.    After the Cook County prosecutors dropped the charges against Mr. Smollett, CPD spokesperson Anthony Guglielmi published on his Twitter account that "Chicago police detectives did an excellent investigation and their work was reaffirmed by an independent grand jury who brought 16 criminal counts. In our experience, innocent individuals don't forget [*sic*] bond & perform community service in exchange for dropped charges"—maliciously implying that Mr. Smollett was guilty of making a false police report.

114.    Similarly, on March 27, 2019, the day after all charges were dismissed against Mr. Smollett, former Chicago mayor Rahm Emanuel appeared on ABC's "Good Morning America" and stated: "[Mr. Smollett's] saying he's innocent and his words aren't true." Mayor Emanuel also demanded that Mr. Smollett pay the City's costs for investigating the report, despite acknowledging that Smollett maintained his innocence, stating: "When [Mr. Smollett] writes the check, in the memo section, he can put the words, 'I'm accountable for the hoax.'"

115.    Aside from the substantial reputational harm the Osundairo Brothers' false statements have caused him, Mr. Smollett has also suffered and continues to suffer substantial economic losses, including but not limited to lost employment opportunities and mounting legal fees, as well as severe mental anguish and distress. Mr. Smollett must also defend against the instant case by the City for investigative costs in a case in which he was the victim of a crime.

## COUNT 1
### State Law Claim for Malicious Prosecution
### (against Counterclaim-Defendants City of Chicago, Michael Theis, Edward Wodnicki, Eddie Johnson, John and Jane Doe Defendants 1-10, Abimbola Osundairo, and Olabinjo Osundairo)

116.    Mr. Smollett incorporates all preceding allegations as if they were fully set forth herein.

117.    Counterclaim-Defendants City of Chicago, through the CPD, including Counterclaim-Defendants Michael Theis, Edward Wodnicki, Eddie Johnson, and John and Jane Doe Defendants 1-10 ("City Counterclaim-Defendants"), caused criminal proceedings to be commenced against Mr. Smollett.

118.    The City Counterclaim-Defendants' conduct in obtaining the false and unreliable statements from the Osundairo Brothers, and using those statements to as the basis for the complaint against Mr. Smollett, and ignoring evidence that contradicted those statements played a significant role in the commencement of proceedings against Mr. Smollett.

119.    Abel Osundairo and Ola Osundairo knowingly provided false information to the CPD and to the grand jury regarding the attack on Mr. Smollett on January 29, 2019, by stating that the attack was a hoax orchestrated by Mr. Smollett.

120.    The prosecution against Mr. Smollett was based upon the false information that the Osundairo Brothers provided to prosecuting authorities.

121.    The City Counterclaim-Defendants subjected Mr. Smollett to criminal proceedings without probable cause.

122.    The City Counterclaim-Defendants knew that there was no probable cause to institute criminal proceedings against Mr. Smollett.

123.    The state of the facts as known by the City Counterclaim-Defendants would not lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that Mr. Smollett committed the offense of filing a false police report.

124.    The City Counterclaim-Defendants' entire basis for prosecuting Mr. Smollett was the self-serving and unreliable statements by Abel and Ola Osundairo, which they made in order to avoid criminal liability.

125.    The City Counterclaim-Defendants facilitated the false statements by the Osundairo Brothers by allowing Ola, in contravention of protocol, to be present while Abel was being interviewed by CPD officers.

126.    In addition, the City Counterclaim-Defendants disregarded or ignored the facts showing that the purportedly key evidence that supported their prosecution of Mr. Smollett was demonstrably false, demonstrating both a lack of probable cause and malice in the institution of proceedings against Mr. Smollett.

127.    Counterclaim-Defendant Johnson's demonstrably false public statements regarding the purported key evidence against Mr. Smollett demonstrate malice and a lack of good faith in instituting criminal proceedings against Mr. Smollett.

128.    Counterclaim-Defendant Wodnicki and Johnson nonetheless authorized the filing of charges against Mr. Smollett and knowingly made false statements, and covered up exculpatory evidence, regarding the Smollett investigation to prosecutors and the public, which further demonstrates malice in the prosecution.

129.    The leaking of admittedly false information by the CPD further demonstrates malice and a lack of good faith in the prosecution of Mr. Smollett.

130.     Counterclaim-Defendant Johnson, as the CPD Superintendent, is the chief executive officer of the CPD, and has full and complete authority to administer the department.

131.     Accordingly, Counterclaim-Defendant Johnson is a policymaker for Counterclaim-Defendant City of Chicago with authority to direct and control the CPD.

132.     In that role, and in the face of mounting public pressure to solve the high-profile attack on Mr. Smollett, Counterclaim-Defendant Johnson authorized the CPD, including Counterclaim-Defendants Wodnicki, Theis, and John and Jane Doe Defendants, to file a criminal complaint against Mr. Smollett on the basis of false and unreliable evidence from the Osundairo Brothers.

133.     Counterclaim-Defendant City of Chicago is liable for the malicious prosecution of Mr. Smollett because a policymaker for the city authorized Counterclaim-Defendants Theis, Wodnicki, Johnson, and John and Jane Doe Defendants 1-10 to initiate the proceedings against Mr. Smollett.

134.     Counterclaim-Defendants Theis, Wodnicki, Johnson, and John and Jane Doe Defendants 1-10 instituted and continued the proceedings maliciously.

135.     The proceedings were terminated in Mr. Smollett's favor and in a manner which indicates his innocence because all 16 counts of the criminal indictment were dismissed two and a half weeks after the indictment was filed.

136.     As a proximate result of the wrongful conduct engaged in by Counterclaim-Defendants, Mr. Smollett has suffered and continues to suffer substantial economic damages as well as reputational harm, humiliation, mental anguish and extreme emotional distress in an amount according to proof at trial.

137.     The City Counterclaim-Defendants' conduct as herein alleged was willful and wanton, and committed maliciously, fraudulently, and oppressively, with the wrongful intent of injuring Mr. Smollett, and in conscious disregard of Mr. Smollett's rights.

WHEREFORE, Mr. Smollett respectfully requests an award of compensatory and punitive damages against the City Counterclaim-Defendants plus the costs of this action, attorney's fees, and whatever additional relief this Court deems equitable and just.

### COUNT 2
### 42 U.S.C. § 1983 Claim – Malicious Prosecution
### (against Counterclaim-Defendants City of Chicago, Michael Theis, Edward Wodnicki, Eddie Johnson, and John and Jane Doe Defendants 1-10)

138.     Mr. Smollett incorporates all preceding allegations as if they were fully set forth herein.

139.     The City Counterclaim-Defendants acted under color of law in acting to institute criminal proceedings against Mr. Smollett without probable cause.

140.     Counterclaim-Defendant Johnson, a policymaker for the city, authorized Counterclaim-Defendants Wodnicki, Theis, and John and Jane Doe Defendants to institute criminal proceedings against Mr. Smollett despite the lack of probable cause in order to close the case, limit the resources expended on investigations, and try to demonstrate to the public that the CPD is competent in its criminal investigations and tough on crime.

141.     Shortly after Mr. Smollett was attacked, the CPD identified the Osundairo Brothers as persons of interest. However, after allegedly expending considerable time and expense to investigate the attack on Mr. Smollett for over a two-week period, the CPD was not able to close its investigation and charge the Osundairo Brothers upon their return to Chicago from Nigeria.

142.     During this two-week period and despite its substantial efforts, the CPD had not discovered the identity of any other individuals who may have been involved in the attack including the white male that had been observed by both Mr. Smollett and an independent witness as the primary attacker.

143.     And, as noted above, Mr. Smollett was unwilling to sign a criminal complaint against the Osundairo Brothers in the absence of any evidence tending to show they were his attackers.

144.     In the face of mounting pressure to solve this high-profile crime, Counterclaim-Defendants Johnson and Wodnicki decided to accept the self-serving and unreliable statements of the Osundairo Brothers, orchestrated by Ms. Schmidt, to allow them to close the case without investigating further.

145.     Given the high-profile nature of the attack on Mr. Smollett, Counterclaim-Defendants Wodnicki and Johnson unreasonably authorized the felony complaint against Mr. Smollett based on the Osundairo Brothers' unreliable and self-serving statements without any further investigation and any independent corroboration.

146.     Despite the lack of probable cause, Mr. Smollett was ultimately charged in an unprecedented 16-count indictment for allegedly making a false report to CPD officers.

147.     Absent Counterclaim-Defendant Johnson's authorization, the CPD, including Counterclaim-Defendants Wodnicki, Theis, John and Jane Doe Defendants, would not have charged Mr. Smollett while probable cause was lacking.

148.     Counterclaim-Defendants Johnson, Wodnicki, Theis, and John and Jane Doe Defendants were aware that there was no probable cause to institute criminal proceedings against Mr. Smollett.

149.    Counterclaim-Defendant Johnson nonetheless authorized the filing of the complaint against Mr. Smollett, knowingly made false statements, and covered up exculpatory evidence regarding the Smollett investigation to prosecutors and the public.

150.    In addition, Counterclaim-Defendant Johnson's demonstrably false statements regarding the purported evidence against Mr. Smollett demonstrate malice.

151.    Following the filing of criminal charges against Mr. Smollett, Counterclaim-Defendant Johnson credited "old-fashioned police work" for closing the case. Superintendent Johnson then went on a publicity tour, in which he appeared on numerous television programs wherein he continued to make knowingly false statements about the evidence in Mr. Smollett's case while touting the CPD's fine detective work and condemning Mr. Smollett.

152.    Those statements by Counterclaim-Defendant Johnson demonstrate that the City Counterclaim-Defendants sought have proceedings commenced against Mr. Smollett based on information that they knew or should have known to be false and unreliable.

153.    The City Counterclaim-Defendants' actions to have charges brought against Mr. Smollett without probable cause are the proximate cause of the violation of Mr. Smollett's constitutional and other legal rights, and Mr. Smollett's injuries.

154.    Those actions deprived Mr. Smollett of his liberty because Mr. Smollett was in custody for approximately 10 hours, and he had restrictions placed on his travel following his surrender to police on February 21, 2019, until the dismissal of charges against him on March 26, 2019.

155.    During this time, Mr. Smollett had to get approval from the court in order to leave the state of Illinois and he had to tell authorities where he was going on each date

and for what purpose. His passport was also confiscated, which he still has not been returned to him to this day.

156.    These are restraints not shared by the public generally, and thus constitute a deprivation of his liberty.

157.    The City Counterclaim-Defendants knew or should have known that no probable cause existed to prosecute Mr. Smollett, based the facts known at the time.

158.    Under the circumstances, it was obvious that prosecuting Mr. Smollett without probable cause would result in the violation of his constitutional and legal rights.

159.    Counterclaim-Defendant Johnson, as Superintendent of the CPD and a policymaker for the City of Chicago, acted with deliberate indifference to Mr. Smollett's constitutional and legal rights, including authorizing and directing the individual City Counterclaim-Defendants to play a significant role in commencing proceedings against Mr. Smollett without probable cause, and therefore acted as a direct and proximate cause of the constitutional and other legal violations, and Mr. Smollett's injuries.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Mr. Smollett demands judgment against Counterclaim-Defendant City of Chicago, and its CPD employees Michael Theis, Edward Wodnicki, Eddie Johnson, and John and Jane Doe Defendants 1-10, for his substantial actual or compensatory damages, plus the costs of this action, attorney's fees, and whatever additional relief this Court deems equitable and just.

## DEMAND FOR A JURY TRIAL

160.    Mr. Smollett hereby demands a trial by jury under Rule 38 of the Federal Rules of Civil Procedure.

## **PRAYER FOR RELIEF**

WHEREFORE, having stated its Answer, Affirmative Defenses, and Counterclaims, Defendant Jussie Smollett respectfully requests the following relief:

1. The Plaintiff should be denied its requested relief;

2. That the Court award Jussie Smollett compensatory and punitive damages, in an amount to be determined at trial; and

3. For all other relief the Court deems just and proper.

Respectfully submitted,

Date: November 19, 2019

/s/ William J. Quinlan
William J. Quinlan
David E. Hutchinson
THE QUINLAN LAW FIRM, LLC
233 South Wacker Drive, 61st Floor
Chicago, Illinois 60606
(312) 883-5500
wjq@quinlanfirm.com
dhutchinson@quinlanfirm.com
*Attorneys for Defendant and*
*Counterclaim-Plaintiff Jussie Smollett*

**<u>CERTIFICATE OF SERVICE</u>**

       I hereby certify that I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants in this case.

/s/ Nicole Griesbach      