IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JUSSIE SMOLLET, | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | No. 19 C 4547 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The City of Chicago filed this lawsuit against Jussie Smollett seeking to recover costs incurred in connection with the Chicago Police Department's investigation of Smollett for allegedly filing a false police report stemming from a January 2019 attack. Smollett filed a counterclaim against the City of Chicago, CPD Detective Michael Theirs, CPD Detective Commander Edward Wodnicki, CPD Superintendent Eddie Johnson, John and Jane Doe Defendants 1—10, (together "the City Defendants"), Abimbola ("Abel") Osundairo, and Olabinjo ("Ola") Osundairo. Smollett alleges state law claims for malicious prosecution against all Defendants and a malicious prosecution claim under 42 U.S.C. § 1983 claim against the City Defendants. Defendants move to dismiss Smollett's counterclaims for failing to state a claim under Rule 12(b)(6). For the reasons discussed below, the Defendants' motions to dismiss [Dkts. 37, 59] are granted.

1

**BACKGROUND**

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). The facts below are drawn from Smollett's Amended Countercomplaint and are accepted as true for purposes of reviewing this motion. *See Vinson v. Vermillion Cty., Ill.*, 776 F.3d 924, 925 (7th Cir. 2015).

According to the Amended Countercomplaint, on or about January 22, 2019, Smollett received an envelope delivered to the Fox production studio in Chicago which contained a racist and homophobic death threat and a white powdery substance. (Dkt. 33 at ¶ 12). At 2:00 a.m. on January 29, 2019, Smollett was physically attacked by masked men who yelled racist, homophobic, and political slurs at him, poured bleach on him, and hung a noose around his neck outside of his Streeterville, Chicago apartment. (*Id.* at ¶ 13). Smollett's primary attacker wore a balaclava-style mask that covered almost his entire face, except for areas around the eyes and nose, and Smollett saw the attacker was white-skinned. (*Id.* at ¶ 14). Smollett returned to his apartment and saw his artistic director, Frank Gatson, who urged him to call the police. (*Id.* at ¶ 15). Smollett was reluctant to do so. (*Id.*). Gatson called 911 on Smollett's behalf. (*Id.*). CPD officers arrived and Smollett told them truthful details of the attack and cooperated in the investigation. (*Id.* at ¶ 16).

CPD treated Smollett as the victim of a crime initially; however, over the course of the investigation, CPD began to anonymously share false and misleading information about the investigation to the media. (*Id.* at ¶¶ 18–19). In early

2

February 2019, the media began to report that the attack was a hoax orchestrated by Smollett. (*Id.* at ¶ 21). Smollett agreed to be interviewed by Robin Roberts on ABC's "Good Morning America" to answer questions about the attack on February 14, 2019. (*Id.* at ¶ 22).

On February 14, 2019, the CPD arrested Abel and Ola Osundairo for perpetrating the attack on Smollett. (*Id.* at ¶ 23). The Osundairo Brothers both knew Smollett prior to the attack. (*Id.* at ¶ 24). The brothers initially denied involvement and expressed surprise that they were persons of interest. (*Id.* at ¶¶ 26–27). For the first 47 hours the CPD interrogated the Osundairo Brothers, the Osundairo Brothers stated they were never involved in the attack and never alleged Smollett orchestrated the attack on himself. (*Id.* at ¶ 30). While holding the Osundairo Brothers, the CPD, including John and Jane Doe Defendants, contacted Smollett through his attorney and asked him to come in to sign a criminal complaint against the Osundairo Brothers. (*Id.* at ¶ 31). Smollett asked if the CPD would show him any evidence that the Osundairo Brothers orchestrated the attack, but the CPD told them they would not, and Smollett declined to sign the criminal complaint. (*Id.* at ¶¶ 32–34). The Osundairo Brothers' attorney consulted with her clients, and at or near the time the CPD was required to charge or release them, the Osundairo Brothers then told the police that they had been involved in the attack and that it was orchestrated by Smollett. (*Id.* at ¶¶ 35–36).

Smollett alleges that the CPD, including Detective Commander Wodnicki, Detective Theis, and John and Jane Doe Defendants, took unorthodox steps in

3

violation of protocol to obtain statements from the Osundairo Brothers and close the investigations. (*Id.* at ¶¶ 38–40). The Osundairo Brothers were released from police custody without charges being filed against them because, according to Smollett, the CPD told the Osundairo Brothers they would go free if they implicated Smollett. (*Id.* at ¶¶ 41–42). CPD sought to have Smollett prosecuted based on the Osundairo Brothers' "false, self-serving, and unreliable" statements, without independent corroboration. (*Id.* at ¶¶ 43–44). On February 20, 2019, the Osundairo Brothers testified before a grand jury in the Circuit Court of Cook County, stating under oath that the attack on Smollett was a hoax that he had orchestrated. (*Id.* at ¶ 46). On February 21, 2019, a felony complaint was filed against Smollett in the Circuit Court of Cook County. (*Id.* at ¶ 47). On March 7, 2019, a felony indictment, based on the testimony of Detective Theis, was returned against Smollett in the Circuit Court of Cook County alleging 16 counts of disorderly conduct, including filing a false police report. (*Id.* at ¶¶ 49–50).

Smollett denies knowledge of the Osundairo Brothers involvement in his January 29, 2019 attack. (*Id.* at ¶ 52). Smollett alleges that the Osundairo Brothers decided with their attorney to advance the hoax narrative to avoid criminal charges, in part because it was already a media narrative. (*Id.* at ¶¶ 53–54). The Osundairo Brothers' attorney stated in interviews that the Osundairo Brothers cooperation with the police was selfless and not motivated by their desire to avoid criminal charges, and she acknowledged that this cooperation shifted the trajectory of the investigation. (*Id.* at ¶¶ 60–62).

4

On February 21, 2019, Superintendent Eddie Johnson held a press conference to address the arrest of Smollett, stating that the attack was a "publicity stunt" and a "phony attack," for which Smollett paid $3,500 to stage because he was dissatisfied with his salary. (*Id.* at ¶ 66–67). Superintendent Johnson repeated these allegations in interviews on February 25, 2019. (*Id.* at ¶ 68). CPD Officers did not interview Fox executives, producers, or Smollett's manager and agent about whether Smollett was dissatisfied with his salary, which the CPD thought was his motive. (*Id.* at ¶ 69). Smollett alleges that the FBI disputed that Smollett sent himself the letter, an assertion Superintendent Johnson made during his February 21, 2019 news conference.[1] (*Id.* at ¶ 70). The Osundairo Brothers' attorney confirmed in interviews that the $3,500 check paid by Smollett to Abel Osundairo was for training and nutrition, not for the attack, which is consistent with the memo line of the check and corroborated by numerous text messages the CPD obtained between Smollett and Abel. (*Id.* at ¶ 73). During the February 21, 2019 press conference, Superintendent Johnson stated that one of the Osundairo Brothers had spoken on the phone with Smollett about an hour after the attack, but telephone records showed that Smollett's next phone call with Abel was about 18 hours after the attack. (*Id.* at ¶¶ 74–75). A CPD spokesperson said that Superintendent Johnson had "misspoken. (*Id.* at ¶ 75). Superintendent Johnson also said that the Osundairo Brothers had gloves on during

---

[1] The Court notes that the article Smollett attaches, which he claims shows the FBI "dispute[d]" the assertion he sent himself the letter, does not show that Superintendent Johnson's statement was "baseless" nor "false" as Smollett indicates in his Countercomplaint. (Dkt. 33 at ¶¶ 68, 70). The article Smollett links only indicates Superintendent Johnson may have "overstated things" and that Federal law enforcement sources were still investigating. *See* https://www.tmz.com/2019/02/22/jussie-smollett-letter-police-chief-superintendent-fbi/.

5

the staged attack but that as far as the CPD could tell, the scratches and bruising on Smollett's face were self-inflicted. (*Id.* at ¶ 76). Smollett alleges that Superintendent Johnson had no basis for that statement since CPD officers knew that the doorman at Smollett's building reported that he had scratches and bruising on his face immediately after the attack. (*Id.* at ¶ 77).

Smollett alleges that the CPD, including Detective Wodnicki, Detective Theis, Superintendent Johnson, and John and Jane Doe Defendants, knew or should have known that the Osundairo Brothers' statements were unreliable. (*Id.* at ¶ 78). The CPD had substantial evidence that supported Smollett's account and undercut the Osundairo Brothers' story that the attack was a hoax, which CPD officers ignored to close the investigation. (*Id.* at ¶ 81). Smollett claims a text sent from Abel about ten hours after the attack which stated, "Bruh say it ain't true, I'm praying for a speedy recovery. Shit is wild," is significant because the Osundairo Brothers did not claim that Smollett told them to send such a text or to claim the message was pretextual. (*Id.* at ¶¶ 82–83). Smollett states that most of the text messages between Smollett and Abel discuss training and nutrition, thus giving rise to an inference that incriminating texts were innocuous. (*Id.* at ¶ 86). One text, which Smollett admits is "susceptible to an incriminating interpretation," read: "Might need your help on the low. You around to meet up and talk face to face?" (*Id.* at ¶¶ 85, 87). Smollett claims that the context of the text was that Smollett asked Abel to meet in person to ask him to acquire herbal steroids while he was in Nigeria. (*Id.* at ¶ 86). Smollett claims that the Osundairo Brothers falsely told CPD officers that the text was

6

Smollett's initial communication to solicit the Osundairos to help him stage the attack, when really it was to enlist the help of his "personal trainer" to obtain banned herbal steroids and help him lose weight. (*Id.* at ¶¶ 88–93).

Smollett alleges that the CPD ignored evidence that supports his case. He claims that the CPD ignored text messages from the Osundairo Brothers demonstrating "a strong homophobic sentiment," (*Id.* at ¶¶ 94–96), and evidence and statements from two independent witnesses indicating that a young white male was involved in the attack. (*Id.* at ¶¶ 97–103). Smollett also claims evidence was ignored that showed the Osundairo Brothers' statements were unreliable, namely that the Osundairo Brothers told CPD officers that Smollett told them not to bring their cell phones to the attack, but statements from an Uber driver and Yellow Cab driver that served as transportation indicated that they did have their cell phones. (*Id.* at ¶¶ 104–10).

## **LEGAL STANDARD**

On a motion to dismiss a counterclaim under Rule 12(b)(6), the Court construes the counterclaim as it would a complaint, in the light most favorable to the counterclaim-plaintiff, accepts the factual allegations as true, and draws all reasonable inferences in the counterclaim-plaintiff's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That statement must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, a counterclaim-plaintiff's claim need only be plausible, not

probable. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). A claim has facial plausibility when the counterclaim plaintiff pleads factual content that allows the court to draw the reasonable inference that the counter-defendant is liable for the misconduct alleged. *NewSpin Sports, LLC v. Arrow Electronics, Inc.*, 910 F.3d 293, 299 (7th Cir. 2018) (quoting *Ashcroft*, 556 U.S. at 678). Yet the complaint "must actually suggest that the movant has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services*, 536 F.3d 663, 668 (7th Cir. 2008) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). Evaluating whether a countercomplaint is sufficiently plausible to survive a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

## DISCUSSION

Smollett brings two claims against Defendants: a state law violation of malicious prosecution against both the City Defendants and the Osundairo Brothers; and a federal malicious prosecution claim under 42 U.S.C. § 1983 against the City Defendants.

### I. Smollett Does Not Plead Sufficient Facts to Show State Law Malicious Prosecution

Smollett alleges a state law malicious prosecution claim against the City Defendants for their conduct in obtaining the "false and unreliable" statements from the Osundairo Brothers, using those statements as the basis for the criminal

complaint against Smollett, and ignoring contradictory evidence. (Dkt. 33 at ¶ 118). Smollett also claims that the City Defendants lacked probable cause to bring charges. (*Id.* at ¶¶ 123–126). Smollett alleges that Superintendent Johnson's public statements demonstrated malice and a lack of good faith in instituting criminal proceedings. (*Id.* at ¶ 127).

In order to bring a malicious prosecution case under Illinois law, Smollett must show: (1) the commencement or continuance by the defendant of an original judicial proceeding against him; (2) the termination of the proceeding in his favor; (3) the absence of probable cause for the proceeding; (4) malice; and (5) damages. *Barnes v. City of Centralia*, 943 F.3d 826, 833 (7th Cir. 2019); *see also Grundhoefer v. Sorin*, 20 N.E.3d 775, 780 (Ill. App. Ct. 2014)). The absence of any of one of these elements bars Smollett from pursuing the claim. *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (citing *Swick v. Liautaud*, 662 N.E.2d 1238, 1242–43 (Ill. 1996)).

In a malicious prosecution case, all elements cannot be pled until the proceedings are terminated in the plaintiff's favor. *See Sneed v. Rybicki*, 146 F.3d 478, 481 (7th Cir. 1998) (citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). Smollett argues that his case has been terminated because a *nolle prosequi* was entered in his favor. The City argues the *nolle prosequi* in his case is distinct since it gave leave to the Special Prosecutor to reinstate charges. (Dkt. 38 at 5; Dkt. 56 at 4). In most cases "a *nolle prosequi* is not a final disposition of a case but is a procedure which restores the matter to the same state which existed before the Government initiated the prosecution." *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997).

9

In this case, according to the Defendants, the City entered the *nolle prosequi* in his case only after Smollett agreed to both the forfeiture of his fine and to serve community service. (Dkt. 38 at 7-8). In short, they assert that the instant matter was terminated with a requirement in return that he perform those two conditions. Involuntary dismissal "is not indicative of the innocence of the accused when [it] is the result of an agreement or compromise with the accused[.]" *Swick*,169 Ill.2d at 513; *see also Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir, 2001) ("A *nolle prosequi* entered as the result of an agreement or compromise with the accused is not considered indicative of a plaintiff's innocence.") At this stage, the Court must take the facts alleged in the Amended Countercomplaint as true. Smollett only asserts that the case was dismissed and does not allege the other conditions. The City in its response, attaches the Certified Record from his case, but the Record only shows the *nolle prosequi* of the charges against him and does not show the other conditions. (Dkt. 56-1). Although Smollett asserts in his Countercomplaint that the Chief of Police stated publicly regarding his case: "In our experience, innocent individuals don't forfeit bond and perform community service in exchange for dropped charges," he asserts this to show that the Chief exhibited malice toward him. (Dkt. 33 at ¶ 113). Of course, the Court could merely ask the Counter-Plaintiff to file an affidavit pursuant to his Rule 11 obligations to provide the Court with the agreement entered into when his charges were dropped. Yet, the Court need not do so since there is another reason that Smollett cannot allege that the charges were resolved in his favor and that is the existence of the Special Prosecutor.

The case that was once dismissed has returned in the form of a Special Prosecutor who had the ability to investigate and press criminal charges against him. It could hardly be said that the case is over since the Special Prosecutor has charged him again. Now he faces the same allegations brought in February 2020 by the Special Prosecutor when another grand jury brought an indictment after hearing the results of a six-month investigation. *See* February 11, 2020 Order, No. 2019 MR 00014. Smollett has been charged with four counts of disorderly conduct for filing a false police report. *Id.* Given this, it cannot be said that the case has terminated, nor can it be said that the case has terminated in Smollett's favor.

Smollett is correct that at this stage, the Court must take his well-pled allegations as true. However, this does not mean that the Court must ignore public documents that are available to the Court such as the indictment from the Special Prosecutor.

Even assuming that Smollett could establish that there was a final disposition in his favor, he must next be able to allege that Defendants did not have probable cause to arrest him. Smollett argues that there was no probable cause because the Osundairo Brothers' statements were unreliable and CPD ignored evidence that supported his account of what occurred that night. (Dkt. 47 at 10–11). Here, however, there was evidence lending itself to probable cause, and the existence of probable cause "acts as a complete defense to an action for malicious prosecution." *Johnson*, 575 F.3d at 659. "In a malicious-prosecution case, probable cause is defined as 'a state of facts that would lead a person of ordinary care and prudence to believe

11

or to entertain an honest and sound suspicion that the accused committed the offense charged.'" *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013) (quoting *Gauger v. Hendle*, 954 N.E.2d 307, 329–30) (Ill. App. Ct. 2011). Probable cause is merely the "probability or substantial chance" that criminal activity exists but "does not require the existence of criminal activity to be more likely true than not true." *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012).

Here, probable cause was met by the Osundairo Brothers' statements to the police and the corroborating evidence of those statements, including videotaped evidence. While Smollett alleges the statements were unreliable and self-serving, he ignores that there was additional evidence to corroborate the Osundairo Brothers' statements, including suspicious texts between the parties and the deposit of a large check to Abel shortly before the attack. (Dkt. 33 at ¶¶ 73, 85, 87). Smollett alleges the Osundairo Brothers' statements were unreliable because they are self-serving, but a reasonable ground for belief of the guilt of an accused may be on information from other persons. *Squires-Cannon v. Forest Preserve District of Cook Cty.*, 2016 WL 561917, *3 (N.D. Ill. Feb. 12, 2016) (citing *Turner v. City of Chicago*, 415 N.E.2d 481, 485 (Ill. App. Ct. 1980). Smollett further states that since this corroborative evidence has allegedly innocuous explanations and because there was exculpatory evidence the police did not investigate, the police lacked probable cause. (Dkt. 47 at 11). While police may not ignore "conclusively established" evidence that defeats probable cause or "clearly exculpatory facts," they do not have to "investigate every potentially exculpatory detail." *Nelson v. Vill. of Lisle*, 437 Fed. App'x 490, 494 (7th Cir. 2011).

12

Given the Osundairo Brothers' confession, plus corroborating evidence, there was ample probable cause causing a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged. *Williams*, 733 F.3d at 759. As there is probable cause, there can be no malice. "Malice" in the context of malicious prosecution means that "the officer who initiated the prosecution had any other motive other than that of bringing a guilty party to justice." *Aleman v. Vill. of Hanover Park*, 662 F.3d 897, 907 (7th Cir. 2011) (citations omitted). Here, CPD's motive was bringing Smollett to justice for a crime it had probable cause to think he committed. Therefore, Smollett's state law claim of malicious prosecution is dismissed against all defendants.

## II. Smollett Does Not Plead Sufficient Facts to Show a Section 1983 Claim

Smollett next alleges a violation for "malicious prosecution" under § 1983. In his pleadings, Smollett does not indicate under which amendment of the Constitution he brings his claim. However, there is no cause of action for malicious prosecution based on the Fourth Amendment. *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018). Recognizing this, Smollett attempts to justify his pleadings stating that "[d]espite the malicious prosecution heading, the factual allegations plausibly state a claim under Section 1983 for the City Defendants' violation of Mr. Smollett's Fourth Amendment rights." (Dkt. 47 at 13). Smollett then claims that the City violated his Fourth Amendment rights by holding him in custody without probable cause. (*Id.* at 14).

13

Smollett cannot now attempt to state that he was bringing a Section 1983 claim for unlawful detention when his Countercomplaint makes no such reference. Having been caught attempting to bring a claim that does not exist, Smollett attempts to retrofit the pleadings and claim that, despite changing the underpinnings of his § 1983 claim, sufficient notice of an unlawful detention claim has been provided to the City Defendants so as to not violate Federal Rule of Civil Procedure 8. (*Id.* at 14). There is not sufficient notice to apprise the City Defendants that Smollett would be bringing an unlawful detention claim rather than a malicious prosecution claim. As pleaded, Count II pertains to "instituting criminal proceedings against Smollett without probable cause." (Dkt. 34 at ¶ 139). While Count II mentions Smollett was deprived of his liberty because "he was in custody for approximately ten hours, and he had restrictions placed on his travel following his surrender to police on February 21, 2019, until the dismissal of charges against him on March 26, 2019," it is clear that this was intended as an injury resulting from the malicious prosecution and not the injury itself. (*Id.* at ¶ 154). Smollett urges that we allow his reply to the City's motion to dismiss serve as a supplement to his pleadings, however, there is no support for allowing a litigant to completely amend his complaint with a new count that is not pled in the original. In fact, this Court and other courts in this Circuit have dismissed complaints where parties have attempted to improperly bring malicious prosecution claims under § 1983. *See Blackmon v. City of Chi.*, 2020 WL 60188, at *4 (N.D. Ill. Jan. 6, 2020); *Neita v. City of Chicago*, 2019 WL 5682838, at *4 (N.D. Ill.

14

Nov. 1, 2019). Smollett has failed to state a claim under § 1983 for which relief can be granted and thus this Count is dismissed.[2]

## CONCLUSION

For the forgoing reasons, the City Defendants' and Osundairo Brothers' Motions to Dismiss [Dkts. 37, 59] are granted with prejudice as to Count I as proceedings are currently ongoing in state court and he cannot bring a state malicious claim until proceedings have been terminated. Count II is dismissed without prejudice. If Smollett wishes to file an Amended Countercomplaint consistent with this Order, he must do so within 21 days of the entry of this Order.

_____
Virginia M. Kendall
United States District Judge

Date: April 22, 2020

---

[2] Smollett's § 1983 would also fail as the CPD can show probable cause based on Smollett's pleadings, as discussed in Part I. An essential element of the Constitutional Right to not be held in custody is that it must be without probable cause. *Manuel*, 903 F.3d 670.