**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CITY OF CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:19-cv-04547 |
| v. | ) | |
| | ) | Honorable Virginia M. Kendall |
| JUSSIE SMOLLETT, | ) | |
| | ) | Magistrate Judge Sunil Harjani |
| Defendant. | ) | |

## CITY OF CHICAGO'S OPPOSITION TO SMOLLETT'S MOTION TO COMPEL

The City of Chicago (the "City") sued Jussie Smollett for making false statements to the Chicago Police Department ("CPD") in connection with Smollett's false claim that he was the victim of a hate crime in January 2019. Smollett now moves to compel the City to produce documents relating to Eddie Johnson's wholly unrelated termination as the Superintendent of CPD in December 2019. The Court should deny Smollett's motion because the information that Smollett seeks is irrelevant to this case.

The City has given Smollett the complete CPD investigative file regarding Smollett's allegations. That file shows that Johnson had no day-to-day involvement in the Smollett investigation. Johnson conducted no interviews, gathered no evidence, allocated no overtime, did not testify in front of the grand jury, and did not direct the activities of the investigating officers. That is unsurprising. At the time of Smollett's staged attack, Eddie Johnson oversaw nearly 14,000 officers who were involved in hundreds of ongoing investigations. Moreover, Johnson's termination had nothing to do with the Smollett investigation or even with Johnson's management of criminal investigations in general. The personal conduct that led to Johnson's termination in December 2019 has no conceivable connection to a lawsuit based on false claims that Smollett

1

made nearly one year earlier. And Smollett has no claims against the City or CPD. Smollett is on trial, not Eddie Johnson.

For all these reasons, information about Johnson's termination will not shed any light on the only questions relevant to this case—did Jussie Smollett knowingly make a false police report and cause the City to incur costs in response? Smollett's efforts to demand this information, even after the Court dismissed his malicious prosecution counterclaim, can be read only as an attempt to distract from facts that have now led two grand juries to indict him. The Court should once again reject Smollett's attempt to "muddy the waters." (Dkt. 25, Oct. 22, 2019, Memo Op. & Order re Def. Mot. to Dismiss ["Oct. 22 Op."] at 17.)

## BACKGROUND

The facts of this case are well-known. In January 2019, Jussie Smollett, an actor on the popular television show "Empire," reported to CPD that he was the victim of a heinous racist and homophobic physical attack at the hands of two unknown white-skinned men. (Compl. ¶¶ 2, 38, 45.) In response to Smollett's report, CPD conducted a thorough investigation using interviews, surveillance videos, in-car taxi camera videos, rideshare records, bank records, and a store receipt. (*Id.* ¶¶ 48-49.) CPD's investigation identified the "attackers" as Abimbola and Olabinjo Osundairo, two acquaintances of Smollett. (*Id.* 48-50.) Interviews, financial records, and other evidence revealed that contrary to Smollett's statements, Smollett himself had orchestrated his own attack by paying the Osundairo brothers to stage the attack. (*Id.*) Smollett was indicted in February 2019, but two weeks later, the State's Attorney's Office dismissed the criminal charges against Smollett *nolle prosequi* in exchange for Smollett's agreement to perform community service and forfeit his $10,000 bond. (Dkt. 33, Smollett's Countercl. ["Countercl."] ¶¶ 111, 113.)

In April 2019, the City contacted Smollett's former counsel to recover the costs the City incurred investigating Smollett's false statements. Smollett's counsel responded by threatening to depose former Mayor Rahm Emanuel and Eddie Johnson and by claiming the City was maliciously harassing Smollett, relying on "defamatory statements," and violating the Constitution. (*See* Ex. B, Letter from Mark Geragos to Ed Siskel (Apr. 4, 2019).)[1] The City then filed this suit against Smollett, alleging that he violated City ordinances by knowingly making false statements to CPD and causing the City to incur substantial costs. (*See* Compl.)

The Court denied Smollett's motion to dismiss in October 2019, holding that the City alleged the details of Smollett's false statements with sufficient particularity, and that CPD's costs were a foreseeable consequence of Smollett's false reports. (Oct. 22 Op.) In so doing, the Court rejected Smollett's attempts to "muddy the waters" by making irrelevant arguments about Rahm Emanuel's statements to the media and the City's motivation for bringing this suit. (*Id.* at 17.)

In November 2019, Smollett filed counterclaims against the City and individual CPD officers including Superintendent Johnson, alleging they maliciously prosecuted him. (Countercl.) Meanwhile, the Circuit Court of Cook County appointed a Special Prosecutor to reconsider the criminal case against Smollett. In February 2020, after a six-month investigation, a grand jury convened by the Special Prosecutor again indicted Smollett, charging him with four counts of disorderly conduct for filing a false police report. (Dkt. 86, Apr. 22, 2020, Memo Op. & Order re Pl. Mot. to Dismiss at 11.) Then, in April, the Court dismissed Smollett's counterclaims, finding that (1) Smollett's criminal proceeding had not terminated in his favor, (2) CPD had "ample probable cause" to initiate proceedings against Smollett, and (3) CPD did not act with malice

---

[1] This letter is publicly available. *See* Megan Crepeau, Empire Actor Jussie Smollett's Lawyer Refuses Chicago's Demand of $130K, Says Actor Will Not Be Intimidated," CHI. TRIB., Apr. 5, 2019, *available at* https://www.chicagotribune.com/politics/ct-met-jussie-smollett-responds-to-city-lawsuit-threat-20190404-story.html

because its motive "was bringing Smollett to justice for a crime it had probable cause to think he committed." (*Id.* at 10-13.)

While the parties litigated the motions to dismiss, they also engaged in discovery. In November 2019, the City served discovery on Smollett. Although Smollett responded with objections in December 2019, he did not produce any documents until April 2020, and he still has produced only about 700 pages, largely emails from his own computer. He has produced only a handful of messages from his multiple phones.

Smollett served discovery on the City in January 2020. Smollett also served subpoenas on the Office of the Inspector General ("OIG") and Joanna Klonsky, a communications consultant to the Mayor. The City told Smollett's counsel that OIG is a City office and Klonsky was working for the City, so any requests for information should have been made as requests for production to the City under Rule 34, not as third-party subpoenas under Rule 45. (Dkt. 57, Mot. to Quash at 3.) Smollett's counsel refused to withdraw the subpoenas and re-issue them as requests, so the City was forced to file a motion to quash. (*Id.*) The Court granted the City's motion in part, directing the City to respond to the subpoenas as document requests and confer with Smollett's counsel regarding any objections. (Dkt. 75, Feb. 19, 2020, Order re Mot. to Quash.)

The parties have conferred several times. The City has agreed to produce documents responsive to nearly all of Smollett's requests, including many documents of dubious relevance. The City started producing documents in March 2020 and has produced over 11,000 pages of responsive documents. The City has continued producing additional documents in recent weeks.

Even though the Court dismissed Smollett's counterclaims against Superintendent Johnson, and even though Smollett has produced only a few hundred pages of discovery, Smollett seeks to compel the production of documents relating to Johnson's termination. The City

terminated Johnson's employment in December 2019 based on his conduct and statements in connection with being found asleep in his car in October 2019. Specifically, Smollett moves to compel production of the following:

- Documents and communications from Joanna Klonsky, a communications consultant retained by the Mayor in late 2019 in connection with Johnson's termination
- Documents related to the OIG's investigation of Johnson in late 2019
- "Any and all Documents relating to or supporting [Mayor Lightfoot's] statement from December 2, 2019, that Eddie Johnson "engaged in a series of ethical lapses that are intolerable" and was "intentionally dishonest."

## ARGUMENT

"Parties may obtain discovery" if it "is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "The party requesting discovery bears the initial burden of establishing its relevancy." *Eternity Mart, Inc. v. Nature's Sources, LLC*, No. 19-CV-02436, 2019 WL 6052366, at *2 (N.D. Ill. Nov. 15, 2019) (citing *Rennie v. Dalton*, 3 F.3d 1100, 1110 (7th Cir. 1993)). "[D]iscovery is not a means for a party to test every conceivable theory of a claim or defense without any limitation." *Id.*

## I.    Eddie Johnson's Termination Is Irrelevant.

The City's case against Smollett is simple. The complaint alleges that Smollett made false statements to CPD and caused the City to incur investigation costs. Information related to Eddie Johnson's termination 8 months after the City filed this lawsuit and 11 months after Smollett's attack simply has no relevance to this case. Smollett nevertheless attempts to manufacture relevance by arguing that Johnson's termination has some bearing on the "integrity of the investigation" into Smollett's staged attack and will help him show the City's claims are false. (Smollett's Mot. at 3, 8.) This argument lacks merit.

Johnson is never mentioned in the City's complaint and was not one of the nearly 50 officers the City identified in its initial disclosures. For good reason: as with any of the thousands

of investigations that took place while he was Superintendent of the nearly 14,000 member CPD, Johnson was not involved in the day-to-day decision making or actual investigating of Smollett's claims. (Ex. A, Decl. of Michael Theis ¶ 5.) He did not conduct interviews or identify witnesses; he did not gather video or physical evidence; he did not draft or serve subpoenas; he did not allocate or record overtime hours; he did not direct the actions of the officers who led the investigation; and he did not testify in front of the grand jury. (*Id.* ¶¶ 6-8.) Any knowledge he had was at most second or third hand. *See Tierra Blanca Ranch High Country Youth Program v. Gonzales*, 329 F.R.D. 694, 698-99 (D.N.M. 2019) (denying discovery request of Governor because she had only "second-hand knowledge" of issues related to lawsuit).

Johnson's lack of involvement should not surprise Smollett. The City has already produced the complete Smollett investigative file. In the thousands of pages detailing every step of the thorough investigation, Johnson's name is never mentioned. If Smollett wants to examine the "integrity of the investigation and the credibility of those involved," he will be more than able to do so. (Smollett's Mot. at 3, 8.) He can review the investigative file, interview records, and evidence (all of which has been produced); identify officers who were actually involved; review those officers' complaint histories and personnel records (which the City has also produced); and perhaps take their testimony. But information related to Johnson's termination could not shed light on the integrity of the Smollett investigation because Johnson had no substantive role in the case.

The timing and context of Johnson's termination confirm the irrelevance of the requested information. First, Johnson was terminated nearly a year *after* Smollett staged his attack and 8 months *after* the City filed suit. *See Stormo v. City of Sioux Falls*, No. 4:12-CV-04057-KES, 2016 WL 697116, at *9 (D.S.D. Feb. 19, 2016) (denying discovery into Mayor's actions "taken after

[the] lawsuit [wa]s filed" against City because discovery would not yield admissible evidence and would not show Mayor had "personal knowledge of matter at hand").

Second, not only did Johnson's termination lack any connection to the Smollett case, it was not even related to his oversight of criminal investigations like Smollett's. The City's termination of Johnson's employment arose out of his conduct and statements in connection with being found asleep in his car in October 2019. This behavior has no bearing on his oversight of criminal investigations; it has no bearing on Smollett's criminal investigation with which Johnson was not even substantively involved; and it certainly has no legitimate relevance to the City's claims in this case or any possible defenses Smollett might have. *See Wofford v. Celani*, No. 11 C 3543, 2012 WL 2847549, at *4 (N.D. Ill. July 11, 2012) (denying motion to compel because movant was seeking irrelevant information regarding complaints about opposing party that were temporally separate and factually distinct from events at issue in suit and thus could not lead to admissible evidence); *Bonner v. O'Toole*, No. 12 C 981, 2012 WL 6591720, at *3 (N.D. Ill. Dec. 18, 2012) (denying discovery into factually different warrants executed by non-party officers because movant could not explain "how such discovery is relevant to the claims alleged in this lawsuit").

Third, Smollett's discovery requests are particularly inappropriate in this case because they are directed against a non-party (Smollett's malicious prosecution claim naming Johnson was dismissed) with no first-hand knowledge of the Smollett investigation. Indeed, every case cited by Smollett involved discovery requests directed at a named party. Even in those cases, courts will allow the discovery only where the officer was heavily involved in the events at issue, unlike the situation here. *Compare Ashford v. City of Milwaukee*, 304 F.R.D. 547 (E.D. Wis. 2015) (denying motion to compel *Monell* defendants to produce police chief's disciplinary files for lack of relevance to illegal strip search claim) *with Beach v. City of Olathe*, No. CIV.A. 99-2210-GTV,

7

2000 WL 960808, at *3 (D. Kan. July 6, 2000) (granting motion to compel police chief's personnel file because he was specifically alleged to be "driving force" behind retaliatory action at issue).

Smollett's theory of relevance would have far-reaching consequences. If Smollett were right, Johnson's credibility (and termination) would be at issue in any of the hundreds of criminal and civil cases relating in any way to investigations that took place when Johnson was Superintendent. That cannot be the law. This case is about whether Smollett made false statements in January 2019, not whether Johnson was untruthful about his personal behavior in October 2019.

## A. Johnson's Statements To The Media Do Not Make His Termination Relevant.

Smollett suggests that this discovery is relevant because Johnson made statements to the media about the Smollett investigation. (Smollett's Mot. at 2-3.) But this case is not about the content of statements to the media. This case is about whether Smollett faked a hate crime against himself and wrongly induced the CPD to expend time, money, and resources to investigate that false claim. The evidence of that claim (the investigative files) has already been produced, and witnesses to the investigation may be deposed. High-level media statements are wholly irrelevant.[2]

Even if the content and accuracy of certain media statements had some relevance (which they do not), Johnson's statements about the actions that led to his termination have no relevance to whether his statements to the media about Smollett were accurate. Otherwise, every witness would be subject to endless inquiries and discovery alleging that unrelated statements were false. *See Windsor Shirt Co. v. New Jersey Nat. Bank*, 793 F. Supp. 589, 615 n. 37 (E.D. Pa. 1992), *aff'd*, 989 F.2d 490 (3d Cir. 1993) (party cannot "argue that the fact that a witness has lied in a statement unrelated to testimony makes it more probable that the witness has lied about any fact offered in testimony" because under the Rules of Evidence, "the evidence of

---

[2] Nor do Johnson's media statements show that Johnson was substantively involved in the Smollett investigation. They reflect only that he was keeping the media apprised of ongoing investigations.

credibility must be connected to some specific fact testified to by the witness"). Even if Johnson's termination-related statements were somehow relevant to Johnson's media statements, the latter have no relevance to what matters here: the accuracy of Smollett's statements to CPD.

**B. Smollett's Claim That He Will Call Johnson As A Witness Does Not Make Johnson's Termination Relevant.**

Smollett further attempts to make Johnson's termination relevant by suggesting that he will call Johnson as a witness at trial and needs this information to impeach Johnson's credibility. (Smollett's Mot. at 1, 3.) This argument fails for several reasons.

First, Smollett cannot call Eddie Johnson as a witness. Under the apex doctrine, high-ranking current and former officials "should not be required to appear for depositions or testify at trial absent extraordinary circumstances."[3] *Buono v. City of Newark*, 249 F.R.D. 469 (D.N.J. 2008) (relying on *United States v. Morgan*, 313 U.S. 409, 422 (1941)); *see Moyle v. Liberty Mut. Ret. Ben. Plan*, No. 10CV2179-DMS MDD, 2012 WL 5373421, at *3 (S.D. Cal. Oct. 30, 2012) ("Former executives [ ] are within the scope of the apex doctrine."). Judges in this district apply the apex doctrine to bar testimony from high-ranking officials "when *any* of four circumstances exist: (1) the official has 'no unique personal knowledge of the matter in dispute'; (2) the information can be garnered from other witnesses or (3) other discovery methods; and (4) sitting for the deposition would impose a hardship in light of the officer's duties." *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 868528, at *1 (N.D. Ill. Feb. 21, 2020) (emphasis added).

Several apex doctrine factors weigh strongly in favor of prohibiting Johnson's testimony. As discussed above, Johnson was not intimately involved in the Smollett investigation and

---

[3] While the apex doctrine is typically used to prevent depositions, courts also apply the doctrine to prevent trial testimony. *See, e.g.*, *Rookaird v. Bnsf Ry. Co.*, No. C14-176RSL, 2016 WL 1258388, at *5 (W.D. Wash. Mar. 31, 2016) (barring apex witness from being called to testify at trial).

received any information from other officers. Johnson thus has no unique personal or first-hand knowledge of the matter in dispute. Any information that Johnson does possess can easily be garnered from other witnesses who were actually involved in the investigation and through other discovery (such as the 3,910 page investigative file the City has already produced as CITY 001251 - 005160). When faced with similar facts, courts regularly bar the depositions of high-ranking officials, including police department heads. *See, e.g.*, *id.* at *2–3 (refusing to allow deposition of governor where he "had no direct role" in issues involved in complaint, he had no "unique personal knowledge" of events at issue, defendant produced other relevant documents, and relevant evidence was obtainable through other witnesses); *Bless v. Cook Cnty. Sheriff's Office*, No. 13 C 4271, 2017 WL 1344522, at *4 (N.D. Ill. Apr. 12, 2017) (rejecting deposition of sheriff because plaintiff failed to give "sufficient reason to believe that [his testimony] would create or lead to unique, admissible evidence").

Second, even aside from the apex doctrine, Smollett still cannot call Johnson as a witness. Again, any information he has about the investigation is second-hand and better explained by the officers actually involved in the investigation. Given these facts, Smollett's sole purpose in calling Johnson as a witness would be to impeach him with his termination and try to paint CPD generally in a bad light. The Seventh Circuit does not allow this tactic: "a party may not call a witness for the sole purpose of impeaching him." *United States v. Kielar*, 791 F.3d 733, 745 (7th Cir. 2015) (upholding trial court's decision not to allow witness to testify) (citation omitted).

Smollett's efforts to distract from the basic facts at issue are part of a troubling pattern. Smollett's lawyers initially tried to deter the City from suing by threatening to depose Johnson and former Mayor Rahm Emanuel and by implying that the City was making defamatory claims. When that failed, Smollett filed a motion to dismiss in which he tried to "muddy the waters," as the Court

put it, by making irrelevant arguments about Emanuel's and Johnson's statements in the media. Smollett also brought unsuccessful counterclaims for malicious prosecution even though he was being investigated by a Special Prosecutor. Now that he has lost both motions and been indicted, Smollett is attempting to further distract from the issues and burden the City by seeking irrelevant discovery. The Court should not reward Smollett's conduct by allowing him to pursue this inappropriate discovery or unnecessarily force Johnson to testify.

## II.     The City's Objections Are Proper And Do Not Narrow The Scope Of Discovery.

Smollett lastly argues that his motion to compel should be granted because the City's objections are generalized, the City has the requested documents in its possession, and it has produced other documents related to Johnson. These arguments are meritless.

Far from being generalized, the City's objections are specific to Smollett's request, and they are valid. The City "specifically object[ed]" to Smollett's request "on the grounds that it seeks information wholly irrelevant to the claims alleged" because the information is related to "Johnson falling asleep in his car several months after Smollett's attack." (City's Resp. at 12.) An objection that specifically invokes the relevant facts is by definition not boilerplate. And it is in this context that the City made its other objections to burden and proportionality. While the City does have custody over the requested documents, there is still a burden associated with searching for and collecting documents relating to Johnson's termination. Burden is always undue when the information sought is so far afield. Weighing this undue burden against the total lack of relevance the requested information has to the issues in this case and the correspondingly minimal benefit served by producing this information further supports the City's position. *See Eternity Mart*, 2019 WL 6052366, at *3 ("Relevancy and proportionality are limits placed on discovery in order to

ensure that when a party seeks information, there is some basis to believe it will bear fruit and lead to admissible evidence at a trial.").

Although the City's primary objection is relevance, its Rule 404(b) objection is also proper. Evidence about the actions that led to Johnson's termination is inadmissible to prove Johnson's "character" or to show that Johnson "acted in accordance with the character" in the Smollett investigation. Fed. R. Evid. 404(b)(1). In support of his contrary view, Smollett cites *Lepianka v. Village of Franklin Park*, No. 03 C 2991, 2004 WL 626830 (N.D. Ill. Mar. 26, 2004), and *DeLeon-Reyes v. Guevara*, No. 1:18-CV-01028, 2020 WL 1429521 (N.D. Ill. Mar. 18, 2020). (Smollett's Mot. 12.) But those cases are inapplicable here.

In *Lepianka*, the defendant officer was accused of excessive force. The court allowed discovery into his disciplinary records because they might show similar "bad acts" that could be used to prove motive, intent, or modus operandi under Rule 404(b)(2). 2004 WL 626830 at *1. Similarly, in *DeLeon Reyes*, the defendant officer was accused of coercing confessions and falsifying evidence. The court allowed limited discovery into "sufficiently similar" acts of misconduct that could it make it more likely the defendant had the intent to extract false confessions and fabricate police reports. 2020 WL 1429521, at *4. Regarding proportionality, the court allowed ten depositions (rather than the requested 250) because the case involved "allegations about murder, kidnapping, police brutality," implicating the "legitimacy of the criminal justice system." *Id.* at *5.

Here, unlike *Lepianka* and *DeLeon Reyes*, Johnson is not a named party. Moreover, Johnson was not even substantively involved in the Smollett investigation, Smollett's false statements do not implicate the legitimacy of the criminal justice system as a whole, and critically, the information sought about Johnson's termination is totally different from the "misconduct"

Smollett suggests he wants to prove. Smollett vaguely suggests that this discovery "may be relevant to establish one of [404(b)'s] permissible uses." But as he makes clear throughout his motion, Smollett intends to use information about Johnson's dishonesty in connection with his termination not to show motive or intent, but to show that Johnson was also dishonest in relation to the Smollett investigation. (*Id.* at 9.) This is classic propensity evidence, which is inadmissible under Rule 404(b). *See United States v. Gomez*, 763 F.3d 845, 854 (7th Cir. 2014) (for Rule 404(b) evidence to be admissible, it must "bear a singular strong resemblance to the pattern of the offense charged . . . [s]ometimes the prior bad act may be too dissimilar to be relevant to show a distinctive pattern, leaving only the forbidden propensity inference"). Johnson lying about his personal behavior is completely unrelated to his honesty overseeing criminal investigations.

Smollett's suggestion that the Court should force the City to produce irrelevant information related to Johnson's termination because the City produced Johnson's training records in response to a different request is particularly offensive. The City made valid objections to the request for Johnson's training records as well as several of Smollett's other requests, including an objection based on the City's then-pending motion to dismiss Smollett's counterclaims. Despite these objections, the City agreed to produce as many responsive documents as possible in an attempt to compromise with Smollett and avoid unnecessary litigation. The City should not be penalized for its attempts at compromise—which have resulted in the City producing over 11,000 pages of documents so far—especially when Smollett himself has produced only a few hundred pages of emails and still has not produced documents responsive to the majority of the City's requests.

Finally, Smollett's suggestion that he needs to review the information related to Johnson's termination to determine whether relevant information is included therein is also unconvincing. As evidenced by the many news articles he cites, Smollett is well aware of the key facts relating

13

to Johnson's termination. He knows Johnson was terminated after being untruthful about the events leading up to being found asleep in his car. This information is not relevant to Smollett's case. The underlying documents related to Johnson's termination and the City's messaging about it are thus also irrelevant. *See Jones v. Union Pac. R.R. Co.*, No. 12 C 771, 2014 WL 1715450, at *2 (N.D. Ill. May 1, 2014) (holding that plaintiff had "nothing but speculation to support her theory that the additional evidence she seeks might reveal some sort of" relevant evidence).

The case that Smollett cites for this argument, *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 423144 (N.D. Ill. Feb. 4, 2019), is completely inapposite. *Andersen* was an alleged wrongful conviction case where the defendant officers sought the plaintiff's criminal history records. *Id.* at *1. Unlike *Andersen*, Johnson is not a party, and Smollett is not seeking criminal history records. More importantly, in *Andersen*, the plaintiff's criminal history was relevant to the key issue in the case—whether he was wrongly convicted. Here, by contrast, Johnson's termination has no bearing on the key issue—whether Smollett made false statements. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny Smollett's motion to compel.

Dated: May 26, 2020

Respectfully submitted,

By:     /s/ Elie T. Zenner
        Renai S. Rodney
        Jennifer K. Bagby
        Elie T. Zenner
        City of Chicago Department of Law
        121 North LaSalle Street, Room 600
        Chicago, IL 60602
        312-744-3992
        renai.rodney@cityofchicago.org
        jennifer.bagby@cityofchicago.org
        elie.zenner@cityofchicago.org

        *Attorneys for Plaintiff City of Chicago*

14

## CERTIFICATE OF SERVICE

I certify that on May 26, 2020, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois using the Court's CM/ECF system, which will automatically send notification of this filing to all counsel of record.

/s/ Elie T. Zenner