**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF CHICAGO,<br><br>                Plaintiff,<br><br>   v.<br><br>JUSSIE SMOLLETT,<br><br>                Defendant. | Case No. 19 C 4547<br><br>Magistrate Judge Sunil R. Harjani |

**MEMORANUDM OPINION AND ORDER**

The City of Chicago brings this action under two sections of the Municipal Code of Chicago, alleging that Jussie Smollett made false statements to Chicago Police Department ("CPD") officers relating to an incident in January 2019, when Smollett was attacked on the street in Chicago. The City maintains that Smollett staged the attack with the assistance of two acquaintances and seeks to recover the costs the City incurred investigating Smollett's alleged false statements to police officers. The parties are engaged in discovery. Smollett now moves to compel production of documents regarding the investigation and termination of non-party Eddie Johnson, the then-Superintendent of the CPD. The City objects to discovery regarding Johnson's termination which occurred some 11 months after Smollett's attack. For the following reasons, Smollett's Motion to Compel Production of Documents [88] relating to Johnson's termination is denied.

**BACKGROUND**

In this case, the City seeks to recover the investigation costs arising from Smollett's allegedly false statements to the City. The City alleges that Smollett made a false police report to CPD claiming that he was the victim of a hate crime and physical assault on January 29, 2019. Smollett reported to police officers that two unknown assailants attacked him on the street in the

Streeterville neighborhood in Chicago. According to the City, Smollett knew his attackers and orchestrated the purported attack himself by paying the assailants to stage the attack. The City also alleges that when police later confronted Smollett with evidence about his attackers, he still refused to disclose his involvement in planning the attack. Smollett disputes CPD's assertion that he made false statements to the City.

The City's two-count complaint alleges that Smollett violated two sections of the Municipal Code of Chicago ("MCC") by knowingly making false statements to CPD and causing the City to incur substantial costs in response. *See* MCC §§ 1-21-010, 1-20-020. Subject matter jurisdiction is based on the complete diversity of the parties. Doc. 1. Count I of the Complaint alleges a violation of Section 1-21-010(a) of the MCC, which provides that any person who "knowingly makes a false statement of material fact to the city in connection with any application, report, affidavit, oath, or attestation" is liable to the city for a civil penalty, up to three times the amount of damages which the city sustains as a result of the person's false statement, and for the city's litigation and collection costs and attorneys' fees. MCC § 1-21-010(a). Count II asserts a claim under Section 1-20-020 of the MCC. Under Section 1-20-020 of the MCC, "[a]ny person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law . . . shall be liable to the city for those costs." MCC § 1-20-020. The City seeks to recover civil penalties, treble damages, and attorneys' fees under these sections of the MCC.

Smollett's defense to this action is that the allegations by the City and CPD are not true. Smollett maintains that he "was not involved in planning the attack on himself and that CPD falsely assert[s] that the attack was a hoax or orchestrated by him." Doc. 88 at 3. In his Answer, Smollett included malicious prosecution counterclaims against the City and individual CPD officers,

2

including Johnson, among others. Smollett was indicted in February 2019, but in March 2019, the Cook County State's Attorney's Office dismissed the criminal charges against Smollett *nolle prosequi* in exchange for Smollett's agreement to perform community service and forfeit his $10,000 bond. Doc. 33 at ¶¶ 111, 113. In February 2020, a grand jury convened by a Special Prosecutor again indicted Smollett, charging him with four counts of disorderly conduct for filing a police report. Doc. 86 at 11. On April 22, 2020, the district court dismissed Smollett's malicious prosecution counterclaims in their entirety, finding that: (1) Smollett's criminal proceeding had not terminated in his favor; (2) CPD had probable cause to initiate criminal proceedings against Smollett; and (3) CPD did not act with malice because its motive "was bringing Smollett to justice for a crime it had probable cause to think he committed." Doc. 86 at 10-13.

During discovery in this case, Smollett served document requests on the City and also served subpoenas on the Office of the Inspector General ("OIG") and Joanna Klonsky, a communications consultant retained by the Mayor of Chicago Lori Lightfoot in late 2019, seeking production of documents relating to the investigation and termination of Johnson. Johnson was the Superintendent of the CPD during the Smollett investigation. In December 2019, after this case was filed, the City terminated Johnson's employment apparently based on his conduct and statements in connection with being found asleep in his car on October 17, 2019. The Mayor reported that Johnson "was intentionally dishonest," "engaged in a series of ethical lapses," and "intentionally misled the people of Chicago and he intentionally misled [her]." *See* Doc. 88 at 3-4. Mayor Lightfoot also stated that "time and again" CPD supervisors "get a pass" for lies they are aware of or that they directed. *Id.* at 4.

In his motion to compel, Smollett seeks production of documents concerning the investigation and termination of Johnson to prepare his defense to the City's claims. The discovery

3

requests at issue pertain to three categories of documents: (1) documents related to Klonsky's consultant work with the City on the communication and messaging regarding Johnson's termination as CPD Superintendent; (2) documents and communications related to the OIG's investigation of Johnson in late 2019; and (3) "[a]ny and all [d]ocuments relating to or supporting [Mayor Lightfoot's] statement from December 2, 2019, that Eddie Johnson 'engaged in a series of ethical lapses that are intolerable' and 'was intentionally dishonest.'" Doc. 88 at 4-5. Because the OIG is a City office and Klonsky was working for the City, the Court directed the City to respond to the subpoenas as document requests. The City also represented that it had possession, custody, or control over the OIG and Klonsky documents. The City objects to producing "documents relating to Eddie Johnson's wholly unrelated termination as the Superintendent of CPD." Doc. 98 at 1.

## **DISCUSSION**

The City's primary objection to the production of the requested Johnson termination documents is relevance. In this vein, Federal Rule of Civil Procedure 26(b)(1) allows a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."[1] Fed. R. Civ. P. 26(b)(1). Moreover, impeachment material may be discoverable, even if the information is not otherwise relevant to the claims or defenses. *See* Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note to 2000

---

[1] Relying on the wrong standard, Smollett argues that he is entitled to discovery about Johnson's termination because it is "relevant to the subject matter of the pending action." Doc. 100 at 9-12. The test of relevancy under Rule 26 is not whether information is "relevant to the subject matter involved in the action." The phrase "relevant to the subject matter involved in the pending action" no longer appears in Rule 26(b)(1) and that standard is no longer applicable to federal civil discovery practice. *See* Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note to 2015 Amendment ("The amendment deletes the former provision authorizing the court, for good cause, to order discovery of any matter relevant to the subject matter involved in the action."). Under Rule 26(b)(1), relevance is tied to the parties' claims and defenses identified in the pleadings and must be proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

4

Amendment ("[I]nformation that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable."); *see also* Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note to 2015 Amendment (noting that "information that could be used to impeach a likely witness" is not foreclosed by the 2015 amendments). Rule 26(b)(1) additionally specifies that information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Finally, when matters are referred to magistrate judges for discovery supervision, they have "extremely broad discretion in controlling discovery." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013).

**A.     Johnson's Termination is Irrelevant to the Claims and Defenses in this Case**

The Court finds that the discovery sought relating to Johnson's termination is not relevant to the *claims or defenses* in this case. The City's complaint sets forth two straightforward claims against one defendant, Smollett. Johnson is no longer a party to this case, and Smollett has no claims against the City or CPD at this time. The City claims Smollett made false statements to CPD that he was the victim of a hate crime and caused the City to incur substantial investigation costs. This case is only about whether Smollett faked a hate crime against himself and wrongly induced the CPD to expend time, money, and resources to investigate that allegedly false claim. Information related to Johnson's termination 11 months after Smollett's attack for conduct related to Johnson being found asleep in his car is not relevant to the City's claims.

Nor is the evidence relevant to Smollett's defense. "Mr. Smollett's defense is that the allegations by the City and CPD are not true." Doc. 88 at 8. Specifically, Smollett's defense is that the incident was a true hate crime, his statements to CPD were accurate, and the event was not staged by him. It then begs the question how Johnson's termination helps demonstrate Smollett's defense that he was actually the victim of a hate crime. Viewed in this manner, it does not because

5

the two acts do not bear any relationship. Either Smollett was a victim of a hate crime and his statements to CPD were true, or it was a staged attack and his statements to CPD were false. Whether Johnson was terminated because he allegedly lied to the Mayor about his conduct in connection with being found asleep in his car does not help prove he was a victim of a hate crime. True, the credibility of officers who will testify about the facts uncovered during the investigation are generally fair game, as discussed later, but part of Smollett's argument is not just that the evidence is necessary for impeachment, but also to outright establish his defense. That is incorrect. It is important to recall that Smollett's malicious prosecution counterclaims have been dismissed by the district judge, and thus the vehicle that he would use to attack the "integrity of the investigation" is no longer viable in this case. The only dispute remaining in this case centers around whether Smollett lied about the incident or if he was telling the truth. The jury will be required to evaluate the evidence of the Smollett attack, and determine whether it was real or staged based on the evidence uncovered about the incident. That, in turn, will determine if Smollett lied or was telling the truth. Johnson's termination has nothing to do with his defense.

Smollett's arguments to the contrary are unpersuasive. Smollett claims that the City's decision to fire Johnson because, as the Mayor stated, he "intentionally misled the people of Chicago and intentionally misled [her]," "will inform Mr. Smollett's defense regarding Johnson's conduct in high-profile investigations, including the Smollett investigation, where Johnson has misled the City and the public." Doc. 100 at 4. More specifically, Smollett argues that documents from Johnson's termination may lead to evidence of Johnson's lack of truthfulness during the early 2019 investigation of Smollett's report of being attacked. *Id*. at 8. Smollett's theory seems to be that because Johnson was dishonest in connection with being found asleep in his car in October 2019, he was also dishonest in relation to the Smollett investigation. He also theorizes that Mayor

6

Lightfoot's statement that "time and again" CPD supervisors, such as Johnson, "get a pass" for lies they are aware or that they directed "may bear directly on the Smollett investigation." Doc. 88 at 9.

Smollett's relevancy theories are not compelling. *First*, it does not follow from Johnson's dishonesty in connection with being found asleep in his car that he was also dishonest in relation to the Smollett investigation. *See United States v. Gomez*, 763 F.3d 845, 861 (7th Cir. 2014) ("[I]t does not follow from the defendant's past acts that he committed the particular crime charged in the case."). A person's prior wrong in an incident does not prove that the person is wrong in every other instance. Indeed, Rule 404(a) and (b) of the Federal Rules of Evidence codifies this concept by barring evidence of character or propensity to act in conformity with prior bad acts at trial.

*Second*, Smollett's theory is premised on the assumption that Johnson was substantively involved in the Smollett investigation. However, the present record shows that Johnson was not involved in the day-to-day decision making or actual investigating of Smollett's claims. Nor did he direct or manage the Smollett investigation. Johnson is not mentioned in the City's Complaint and was not one of the nearly 50 officers the City identified in its initial disclosure of persons likely to have discoverable information. According to the City, this is because Johnson "did not conduct interviews or identify witnesses; he did not gather video or physical evidence; he did not draft or serve subpoenas; he did not allocate or record overtime hours; he did not direct the action of the officers who led the investigation; and he did not testify in front of the grand jury." Doc. 98 at 6. The City supports these assertions with the declaration of Michael Theis, one of the primary detectives assigned to investigate the report by Smollett that he was attacked on January 29, 2019. Theis states in his declaration that former Superintendent Johnson was not involved in the day-to-day investigation of Smollett's report. Doc. 98-1 at ¶ 5. Theis determined the direction of the

7

investigation and made decisions about what evidence to gather and what witnesses to interview. *Id.* at ¶ 4. Johnson did not conduct any interviews or gather any evidence in the Smollett investigation. *Id.* at ¶¶ 7, 8. Finally, Theis did not receive orders from Johnson in relation to the Smollett investigation and no orders were relayed to Theis from Johnson by others. *Id.* at ¶ 6. Theis's declaration demonstrates that Johnson was removed from the daily subjects of the Smollett investigation and did not control or direct the investigation.[2]

The City has also produced the complete investigative file on the Smollett case. Over two dozen CPD officers and detectives participated in the extensive investigation, using interviews, surveillance videos, Office of Emergency Management pod videos, in-car taxi camera videos, rideshare records, bank records, and a store receipt. Doc. 1-1 at ¶¶ 48, 49. The City states that in the 3,910 page investigative file detailing every step of the investigation, Johnson's name is never mentioned. Smollett does not contest this assertion. Although Smollett has the complete investigative file, he has offered nothing to refute Theis's declaration. These facts lead to only one plausible conclusion—that Johnson was not substantively involved in the Smollett investigation and he has no personal or first-hand knowledge about the investigation.

The only other asserted connection to the Smollett investigation is Johnson's public statements made on behalf of the CPD. Smollett cites Johnson's numerous appearances, statements, and interviews as evidence of his involvement in the Smollett investigation. Doc. 100 at 5-6. Smollett points out that Johnson "made nearly a dozen public statements regarding the particulars of the Smollett investigation between January 29, 2019, and April 29, 2019, when the

---

[2] Smollett suggests that reliance on Theis's declaration is not proper because it is qualified by the language "to the best of my knowledge." Docs. 98-1 at 1, 100 at 2. The Court rejects Smollett's suggestion and finds that Theis's declaration was properly submitted under penalty of perjury and satisfies the requirements of 28 U.S.C. § 1746. *See Joseph v. Sniezek*, 2016 WL 5078378, at *5 (M.D. Pa. Sept. 20, 2016) (finding declaration qualified by the language "to the best of my knowledge and belief" complied with the requirements of 28 U.S.C. § 1746 where is was both verified and submitted under penalty of perjury).

City brought its lawsuit against Smollett." Doc. 100 at 3. In particular, Smollett cites to Johnson's public statements that: Smollett "staged the attack because he was dissatisfied with his salary; Mr. Smollett's injuries were 'most likely self-inflicted'; the notion that the attack had been orchestrated 'pissed everybody off'; and suggested that Mr. Smollett should apologize and reimburse the City for the funds devoted the investigation." Doc. 88 at 2-3. Although these public statements may demonstrate that Johnson was kept apprised of the relevant issues, none of the cited public remarks establish that Johnson had any direct, personal knowledge of the underlying events or substantive involvement with the Smollett investigation. Rather, it is clear that Johnson's statements were issued on behalf of the CPD, and not by Johnson personally, to aid the public's understanding in a high profile case. Indeed, like the head of any government entity or public agency, it is one of the duties of the Superintendent to address the public, face the media, and explain CPD's actions. Thus, the public almost often hears from the Superintendent at the podium and not the investigating police officers. Simply being head of a government agency and making public statements about an investigation is not enough to meet the relevance standard under Rule 26. Otherwise, Johnson's termination records would to be subjected to discovery in any of the hundreds of criminal and civil cases relating to investigations that took place when Johnson was Superintendent. The law does not require such an absurd result and Smollett does not cite any caselaw which would support such a far-reaching outcome in every case that was investigated while Johnson was Superintendent. Discovery gives parties the freedom to explore theories and avenues to build their case, but it does not permit an unlimited exploration into all imaginable scenarios without any firm relationship to the witnesses in the litigation.

Smollett contends that similarly situated public officials have been compelled to produce discovery and even testify "after publicly speaking on related matters." Doc. 100 at 6. The first

9

authority relied upon by Smollett is easily distinguishable on several grounds. In *Howard v. City of Chicago*, 2006 WL 2331096 (N.D. Ill. Aug. 10, 2006), the magistrate judge held that "[h]aving voluntarily agreed to respond publicly to questions from [Oprah] on the basis for his decision to pardon the Plaintiffs and the evidence he considered in making that decision, [former Illinois Governor Ryan] cannot now claim a privilege to refuse to give testimony in a civil case [brought by the wrongly convicted criminal defendants] on that same topic. *Id*. at *8. This case is unlike *Howard* because: (1) Johnson's termination documents are wholly unrelated to the Smollett investigation, the subject of Johnson's public statements; (2) Ryan personally made the decision to pardon the plaintiffs and had first-hand knowledge of the evidence he considered in making that decision; and (3) the City is not claiming any privilege regarding the Johnson's termination documents. In a docket entry in the other case cited by Smollett, a district judge denied the City's motion *in limine* to bar Plaintiffs from introducing any evidence of former Mayor of Chicago Rahm Emanuel's public comments regarding the existence of a police "code of silence" or attempts to call him to testify at trial. *Spalding, et al. v. City of Chicago, et al.*, Doc. 255, Case No. 12 C 8777 (N.D. Ill. May 20, 2016). The Court does not find the *Spalding* case to be persuasive as the docket entry does not provide any explanation as to why the motion was denied, and the *Spalding* case did not involve a discovery issue.

*Third*, there is no reason to believe that Johnson's termination was related to his oversight of the Smollett case. The record shows that Johnson's termination had nothing to do with his conduct in high profile cases like Smollett's. It appears that Johnson was terminated for being dishonest about the events leading up to being found asleep in his car in October 2019, almost nine months after Smollett's attack. That explanation was set forth in many news articles at the time, and the record contains no facts to support the suggestion that the City's termination of Johnson's

employment was in any way connected to his oversight of criminal investigations like Smollett's. It is also unreasonable to interpret the Mayor's statement that "time and again" CPD supervisors "get a pass" for lies they are aware of or that they directed as inferring that Johnson's termination was related to the Smollett investigation. The Mayor's statement, standing alone, is a general statement and not specific to any particular matter. It was also made nearly a year after Smollett's attack. Thus, it does not provide a factual basis to warrant discovery into the Johnson termination. Therefore, Smollett's suggestion that there may be a connection between Johnson's termination and the Smollett investigation is pure speculation. *Eternity Mart, Inc. v. Nature's Source LLC*, 2019 WL 6052366, at *3 (N.D. Ill. Nov. 15, 2019) ("Such speculation, without a showing by [Defendant] that the responses are likely to yield relevant information about the February 27, 2019 suspension [as issue], amounts to an impermissible fishing expedition in this case.").

In conclusion, Smollett has not shown that documents concerning the details of the investigation that led to Johnson's termination are relevant to the City's claims to recover costs in response to the Smollett investigation or to the development of Smollett's defense in this case. The record also demonstrates that Johnson's termination was not related to the Smollett investigation and that Johnson was not personally involved in the Smollett investigation at issue.

**B.      Johnson's Credibility Is Not At Issue In This Case**

Smollett alternatively argues that to the extent records related to Johnson's termination "do not directly address the Smollett investigation, those materials remain relevant for discovery regardless for the credibility and potential impeachment of former Superintendent Johnson as a witness in this litigation." Doc. 88 at 9. The City argues that Johnson's credibility is not at issue in this case, given that he did not participate in the investigation that led to Smollett's indictment. The Court agrees. Smollett has not proffered a plausible scenario under which Johnson is a likely

witness. In short, because there has been no showing that Johnson is likely to testify in this case, evidence concerning his character for truthfulness is not relevant and documents related to his termination are not discoverable for potential impeachment.

Impeachment evidence can be relevant and discoverable, but the person to be impeached must be a "likely witness." Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note to 2000 Amendment. Smollett argues that the Johnson termination information may be used to impeach Johnson's credibility pursuant to Federal Rule of Evidence 608(b). Rule 608 governs the admission of evidence of a witness's character for truthfulness or untruthfulness. In pertinent part, Rule 608(b) provides that "specific instances of a witness's conduct . . . may, on cross-examination . . . be inquired into if they are probative of the character for truthfulness or untruthfulness." Fed. R. Evid. 608(b). Johnson's alleged dishonesty which lead to his termination clearly goes to his truthfulness. *See United States v. Miles*, 207 F.3d 988, 993-94 (7th Cir. 2000) (conduct related to fraud, deceit, or dishonesty "plainly relate[s] to a witness's truthfulness or untruthfulness"). Thus, pursuant to Rule 608(b), if Johnson testified, he might be subject to impeachment and attacks on his character for truthfulness through cross-examination as to his conduct which led to his termination.[3]

However, as explained above, there has been no persuasive showing that Johnson has personal knowledge of the Smollett investigation such that he would be a likely witness at trial. The City does not intend to call Johnson at trial. *Cf. Harris v U.S.*, 121 F.R.D. 652, 656 (W.D. N.C. 1988) (granting defendant's motion to compel information on each heir's criminal record

---

[3] Smollett asserts that Johnson's conduct may be relevant to establishing one of the permissive uses under Rule 404(b), but does not provide any detail as to how the evidence would satisfy any of the permissive uses. Nevertheless, the argument need not be dwelled upon as Johnson is not a likely witness at trial such that discovery is warranted on this basis.

because "[p]laintiff has stated that unspecified heirs may testify at trial."). And Smollett cannot call Johnson to testify regarding facts about which he does not have personal knowledge. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). As explained above, the evidence presented by the City shows that Johnson lacks the requisite personal knowledge of the Smollett investigation. Moreover, Smollett cannot call Johnson as a witness solely to impeach him with his termination and try to put CPD in a negative light. *United States v. Kielar*, 791 F.3d 733, 745 (7th Cir. 2015) ("It is well established that 'a party may not call a witness for the sole purpose of impeaching him.'"). Accordingly, since he is not a likely witness at trial, Johnson's credibility is not at issue and no justification exists for producing his termination records. In contrast, discovery on the credibility of testifying officers who have personal knowledge of the investigation is appropriate, and the City has already produced the investigative file, interview records, and documentary evidence, and Smollett can identify officers who were involved in the investigation; review those officers' complaint histories and personnel records (which the City has also already produced); and take their deposition testimony. Thus, Smollett will obtain the evidence he needs to challenge the credibility of witnesses.

Finally, Smollett argues that it is improper to consider the likelihood that Johnson will be called to testify at trial because information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Of course, it is true that evidence may be produced in discovery regardless of its admissibility at trial. However, under Rule 26(b)(1), the Court must still evaluate relevance, and not order production of potential impeachment material of a non-party who does not have personal knowledge of the facts of the case, and thus is unlikely to testify at trial. Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note to 2000 Amendment. If the Court did

not do so, any party could simply utter the word "witness," and impeachment discovery would then have to be allowed on that individual. The federal rules do not allow parties to have the final say of what evidence is relevant in discovery or who is a likely witness at trial. Rather, courts are charged with managing discovery to ensure the "just, speedy and inexpensive determination of every action and proceeding," and are the gatekeepers of the discovery that parties may obtain. *See* Fed. R. Civ. P. 1. Moreover, the Federal Rules of Evidence, while not governing whether discovery is ordered, still inform federal court decisions on the scope of discovery. To be clear, the parties will undoubtedly raise the issue of trial witnesses with the district judge at a later time and nothing in this Court's ruling is intended to limit any party's ability to call witnesses at trial. The only question before the Court is whether to allow discovery into Johnson's termination, and for the reasons stated above, that request is not well-founded. The City may publicly release more information about Johnson's termination, as it has recently done with certain documents and body camera footage related to the incident that led to the firing of Johnson. But the Court will not order it to do so in this case.

## CONCLUSION

The Court sustains the City's objections. Smollett's Motion to Compel Production of Documents [88] is therefore denied.

**SO ORDERED.**

Dated: July 6, 2020

                                                Sunil R. Harjani
                                                United States Magistrate Judge